SMOKE RISE, INC., a Maryland
Corporation, et al.

v.

WASHINGTON SUBURBAN SANI-
TARY COMMISSION et al.

Civ. A. No. N–73–1031.

United States District Court,
D. Maryland.

Aug. 18, 1975.

Joseph P. Blocher and John J. Delaney and Linowes & Blocher, Silver Spring, Md., for plaintiffs.

Paul T. Sisson, Silver Spring, Md., Gen. Counsel for defendant Washington Suburban Sanitary Comm.

Richard S. McKernon, County Atty., and John B. Walsh, Jr., Asst. County Atty., for defendant Montgomery County, Maryland.

Joseph S. Casula, County Atty., and James F. Sharkey, Associate County Atty., for defendant Prince George's County.

Francis B. Burch, Atty. Gen. of Maryland and Donald H. Noren and Paul M. Vettori, Asst. Attys. Gen., for defendant Maryland Dept. of Health and Mental Hygiene.

Francis B. Burch, Atty. Gen., of Maryland and Warren K. Rich, Asst. Atty. Gen., and Edward F. Lawson, Special Atty. Gen., for defendant Maryland Environmental Services.

Robert H. Levan and Sanford E. Wool, Silver Spring, Md., for defendant Maryland-National Capital Park and Planning Comm.

NORTHROP, Chief Judge.

In this case, plaintiffs, all of whom are active in the home construction industry in the State of Maryland, challenge the constitutional and statutory validity of the various sewer hook-up moratoria which are presently in force in the several river basins of Prince George's and Montgomery Counties. Plaintiffs have brought their complaint under the fifth and fourteenth amendments of the United States Constitution, and seek declaratory and injunctive relief on the grounds, *inter alia*, that they have been deprived of their property without due process and that their property has been taken for public purpose without just compensation. Defendants, who are state and local government agencies responsible either directly or indirectly for implementation of the various sewer moratoria, have all filed separate motions to dismiss.

On April 5, 1974, this Court granted defendants' motions to dismiss with leave for plaintiffs to amend within thirty days. On June 3, 1974, after obtaining by motion an extension of time for an additional thirty days, plaintiffs filed an amended complaint against all the original defendants except the District of Columbia and Russell E. Train, Administrator of the Environmental Protection Agency. The case is now before this Court on the new motions of the remaining defendants to dismiss the amended complaint. Two of these motions were granted at the hearing on November 1, 1974, with regard to defendants Maryland Environmental Services and Maryland-National Capital Park and Planning Commission. Although the amended complaint was filed as a class action, the Court notes that plaintiffs have failed to pursue certification of same pursuant to Rule 23 of the Federal Rules of Civil Procedure.

### JURISDICTION

▮ Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 due to the existence of a federal question arising under the United States Constitution. It is argued by defendants that this Court lacks jurisdiction because it appears on the face of the amended complaint that plaintiffs have failed to present a federal question. This contention, however, as evidenced by the memoranda in support of defendants' motions to dismiss, goes to the merits of the complaint rather than to the jurisdiction of this Court. In this regard, this Court believes that the admonition of the Supreme Court in *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), should be followed here:

Jurisdiction, . . . is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of

jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction. [Citations omitted.]

The above language was recently reiterated by the Supreme Court in *Hagans v. Lavine*, 415 U.S. 528, 542–43, 94 S. Ct. 1372, 1382, 39 L.Ed.2d 577 (1974), a case which summarized defendants' jurisdictional challenge in words which this Court adopts as its own:

As was the case in *Bell v. Hood,* we cannot "say that the cause of action alleged is so patently without merit as to justify, even under the qualifications noted, the court's dismissal for want of jurisdiction." 327 U.S., at 683, 66 S.Ct., at 776. Nor can we say that petitioners' claim is "so insubstantial, implausible, foreclosed by prior decisions of this Court or otherwise completely devoid of merit as not to involve a federal controversy within the jurisdiction of the District Court, whatever may be the ultimate resolution of the federal issues on the merits." *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666–667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974). [Citations omitted.]

### FACTS

The following facts have been selected from plaintiffs' amended complaint to serve as a background to the ensuing legal discussion. This case arises upon defendants' motions to dismiss, and therefore, the well-pleaded, material allegations of the complaint are taken as being admitted. 2A J. Moore, Federal Practice ¶ 12.08, at 2265–69 (2d ed. 1974).

On May 20, 1970, Dr. Neil Solomon, Secretary of the Department of Health and Mental Hygiene [hereinafter, "Secretary" or "Department"], issued five orders directed to the Washington Suburban Sanitary Commission [hereinafter, "WSSC"] declaring moratoria of varying degrees on public sewer service in the Anacostia, Cabin John, Parkway, Piscataway, and Western Branch drainage basins of Montgomery and Prince George's Counties. In each case, these orders followed a determination by the Department that ". . . inadequate sewerage facilities, owned and operated by the Washington Suburban Sanitary Commission, cause discharges of raw and inadequately treated sewage into waters of the State and thereby constitute a menace and nuisance to the health, safety and comfort of the public." Amended Complaint, Exh. C. The Secretary's moratorium order of May 20, 1970, was revised and amended on November 9, 1971, and again on August 16, 1973, in order to keep abreast with the evolving scope of the sewer crisis.

While it is alleged by plaintiffs that the Secretary failed to couple his moratoria orders of May 20, 1970, with a positive remedial program of any type, this Court notes to the contrary that WSSC was ordered by the Secretary, *inter alia,* to construct and place into operation a relief sewer in the Cabin John Basin no later than December 31, 1971, to increase the hydraulic capacity of the Parkway sewage treatment plant as soon as December 31, 1970, to enlarge the overall capacity of the Parkway plant by no later than July 31, 1972, and to report within sixty days on methods and actions which could be taken for utilization of the existing surplus capacity of the Western Branch wastewater treatment plant to reduce sewage flows to overloaded facilities in the Anacostia basin.

In October, 1970, the District of Columbia, Fairfax County, Virginia, and defendant WSSC entered into a memorandum of understanding with each oth-

er regarding the allocation between the three jurisdictions of the expanded capacity projected for the regional Blue Plains wastewater treatment plant. The capital improvement of the Blue Plains facility, as outlined in the memorandum of understanding of October, 1970, called for an enlargement from a present capacity of 240 mgd (million gallons daily) to a 309 mgd capacity by 1977. Of the projected additional capacity at the Blue Plains plant, 148 mgd thereof was allocated to the WSSC.

It was recognized in the memorandum of understanding that the enlargement of the Blue Plains facility would not be sufficient to meet projected population increases, and, accordingly, WSSC set forth in the memorandum the time table for site selection, design, and construction of an additional regional plant. Site acquisition was to be completed by March 1973, and construction was to be completed by June of 1977. However, completion of the new regional plant was expressly made ". . . subject to the availability of funds and the operation of applicable provisions of Maryland law." Memorandum of Understanding, October, 1970, ¶ 6, Amended Complaint Exh. D.

In October, 1971, defendant Montgomery County adopted a program to construct an advanced wastewater treatment facility, site selection to be made by November, 1972. Two months after this deadline, on January 16, 1973, the Montgomery County Council voted to approve Dickerson, Maryland as the site for the new plant. One week later, on January 23, 1973, the County Council reversed its earlier decision, rejected Dickerson as the approved site, and selected Darnestown, Maryland in its place. One week thereafter, on January 30, 1973, the County Council, at the request of the County Executive, reversed its decision of January 23, 1973, and voted to defer site selection for an indefinite time. Finally, on March 6, 1973, the Montgomery County Council, acting contrary to the recommendations of the County Execu-

tive, Maryland Environmental Services, the Department of Health and Mental Hygiene, the Maryland-National Capital Park and Planning Commission, the Interstate Commission on the Potomac River Basin, and planning bodies of the Washington Metropolitan Area Council of Governments, selected Darnestown as the location for the advanced wastewater treatment plant.

In August, 1973, six months after this decision, and following significant expenditures by Montgomery County for design studies at the Darnestown location, the United States Environmental Protection Agency rejected the location of the outfall lines into the Potomac River from said site, thereby eliminating Darnestown as a location for the new wastewater treatment plant. Following this event, and after the County Council failed twice to meet new deadlines imposed by the Governor of the State of Maryland for selection of a new site, the Governor, on October 15, 1973, designated Dickerson, Maryland as the site for the new plant. As a consequence of these events, plaintiffs claim that Montgomery County Council has abused its legislative discretion with the result that plaintiffs have been deprived of their property without just compensation and without due process in violation of the fifth and fourteenth amendments of the United States Constitution.

The Washington Suburban Sanitary Commission is a body corporate organized and existing under the laws of the State of Maryland. WSSC is required, under its own regulations (the WSSD Code) as well as under the laws of the State of Maryland, Prince George's and Montgomery Counties, to construct and maintain on a monopoly basis a sanitary sewer system within the Washington Suburban Sanitary District. The Sanitary District extends throughout those portions of Prince George's and Montgomery Counties which are suburban to the Washington Metropolitan area. WSSC is authorized to proceed with the construction of sewers within the juris-

diction of the Sanitary District, to issue bonds to pay the cost of the construction thereof, and to charge fees and front-foot benefit assessments to pay for the right to connect to said sewer system. It is the respective County Councils of Prince George's and Montgomery Counties which must approve and adopt WSSC's annual capital and operating budget.

On May 31, 1972, WSSC adopted Resolution No. 72–041, Amended Complaint Exh. I, which, in addition to carrying forward the ban which had previously been imposed by the Department of Health and Mental Hygiene regarding the Cabin John and Anacostia basins, set forth further moratoria on sewer hookups in all other watershed basins in Montgomery County. The extent of said additional sewer limitations varied with the inadequacy of the existing treatment systems in the several watershed basins. As stated in the preamble to Resolution No. 72–041, the WSSC moratorium order was adopted ". . . on an interim, emergency basis . . ." and ". . . for the immediate preservation of the public health and safety, and for the protection of the Commission's sanitary sewerage system, . . .." On June 21, 1972, WSSC adopted Resolution No. 72–053, imposing, on the same basis as Resolution No. 72–041, further moratoria of varying degree on watershed basins in Prince George's County.

On February 13, 1973, the Montgomery County Council adopted Resolution No. 7–1071 regarding implementation of an interim sewerage program until such time as the new advanced wastewater treatment facility should be completed. The interim program called for construction of a five mgd package plant in the Seneca Basin and a two to four mgd plant in the Anacostia River Basin. Pending the adoption of a policy for allocating the additional interim capacity between various land uses, the County Council directed WSSC to immediately cease issuing authorizations or commit-

ments for new sewer connections within the Montgomery County portion of the WSSC system. In response to this directive, the WSSC, on February 15, 1973, commenced a program of deferring or refusing to act on applications for sewer service in Montgomery County.

On July 11, 1973, the Department of Health and Mental Hygiene rejected the interim sewerage treatment program established by Montgomery County Council in Resolution No. 7–1071. Only one month later, however, on August 16, 1973, the Department issued a new series of moratoria orders supplementing and amending the original order of May 30, 1970. The Department ordered WSSC not to grant any authorization, connection, or hookup with the Watts Branch, Rock Run, Oxon Run, Muddy Branch, Rock Creek, Seneca, or Little Falls basins tributary to the Blue Plains plant. Overflow problems in the Cabin John and Anacostia basin were addressed in separate orders. All of these orders were based on a determination that ". . . the capability of sewerage facilities at the wastewater treatment plant at Blue Plains to provide adequate treatment is being exceeded, which conditions continue [*sic*] to cause discharges of raw and inadequately treated sewage into the waters of the State, which waters are being, or are likely to become polluted in a way dangerous to health, thereby constituting a menace and nuisance prejudicial to the health safety and comfort of the public." Order of the Department of Health and Mental Hygiene, August 16, 1973, Amended Complaint Exh.L.

The following month, on September 12 and September 17, the Montgomery County Council met with members of the WSSC. At those meetings, it was recognized that, in addition to the existing overflow situation in the Anacostia and Cabin John basins, calculated peak flows in the Little Falls, Rock Creek, and Seneca basins could exceed design capacity. Accordingly, on September 18, 1973, the Montgomery County Council,

through a letter to Dr. Peterson, WSSC chairman, strongly recommended that WSSC impose a more stringent rule regarding exceptions to the August 16th orders of the Department of Health and Mental Hygiene.

Acting upon this recommendation and in response to the August 16 orders of the Department, WSSC adopted, on September 19, 1973, Resolution No. 74–141. Whereas the August 16 orders of the Secretary permitted an exception in the Cabin John and Anacostia basins for buildings for which building permits had been issued as of August 16, 1973, WSSC Resolution No. 74–141, pursuant to the September 18 recommendation of the Montgomery County Council, declared that no hookups would be provided for such buildings unless construction under said building permits was under way as of September 13, 1973. Whereas the August 16, 1973 orders of the Secretary allowed, in the Rock Creek, Seneca and Little Falls basins, implementation of sewer authorizations approved by WSSC prior to March 29, 1972, the WSSC Resolution No. 74–141 of September 19, 1973, declared that hookups would not be allowed in said basins unless building permits had been issued as of September 13, 1973. Plaintiffs characterize the recommendations of Montgomery County Council to WSSC as directives and allege that said directives were contrary to and in violation of the August 16, 1973 orders of the Secretary and were therefore unlawful.

On October 18, 1973, plaintiffs filed their original complaint with this Court.

The first Montgomery County interim sewerage program (February 13, 1973, Resolution No. 7–1071) having been rejected in July, 1973, by the Department of Health and Mental Hygiene, a second interim program to ameliorate the sewer crisis was adopted by the County Council on December 11, 1973, by means of Resolution No. 7–1539, Amended Complaint Exh.P. The new interim program set forth numerous capital investment projects and/or policies to be undertaken in each watershed basin to the end that existing and potential sewer overflows might be alleviated. For example, regarding the Anacostia basin, Resolution No. 7–1539, *supra* at p. 9 declared:

*Anacostia Basin Facilities and Policies.* Relief of the most severe Anacostia basin sewerage restrictions is contingent on completion of WSSC project S 89, Anacostia Force Main and Pumping Station, as approved by the Prince George's County Council for inclusion in the WSSC FYS 1974–1979 Capital Improvements Program, and provisions of adequate treatment capacity at the Blue Plains STP [sewer treatment plant]. The County Council therefore urges the immediate construction of these projects. *The County Council recognizes the interjurisdictional and mandatory review difficulties involved with the implementation of S 89,* and therefore urgently requests that the WSSC promptly report on the possibilities of constructing in the Anacostia basin a temporary surge facility for temporary retention of peak sewage flows to prevent overflows. . . . [Emphasis added.]

Regarding the Seneca Creek basin, the Court notes that, contrary to the allegations of plaintiffs, the Montgomery County Council did reaffirm per its Resolution No. 7–1539 of December 11, 1973, ". . . approval of the construction of a 5 mgd interim treatment plant to be located at the Riffleford Road, Seneca Creek site, . . .." Resolution No. 7–1539, *supra* at p. 11, went on to say in words characteristic of the Montgomery County interim program:

The County Council has approved and hereby reaffirms as alternative to S 108 [the Seneca Creek 5 mgd plant], if necessary, interim treatment plants designated as S 108.2 and S 108.3. WSSC shall immediately pursue the necessary State and Federal permits for the construction of projects S 108,

S 108.2 and S 108.3. The County Council indicates its strong support for the most appropriate combination of sizes, processes and locations which will provide 5 mgd of interim treatment plant capacity in the most expeditious manner possible consistent with the protection of public health.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

As a preliminary issue, this Court must pass on the claim of defendant Department of Health and Mental Hygiene that plaintiffs' failure to exhaust available administrative remedies requires dismissal of this action at this time. Pursuant to Md. Ann. Code art. 41, §§ 206A and 206B (1971), there exists within the Department of Health and Mental Hygiene a quasi-judicial Board of Review whose function is to hear and determine appeals from certain decisions of the Secretary of the Department.

The Department asserts the applicability of the doctrine of exhaustion of administrative remedies on two separate grounds. First, it is alleged that plaintiffs are free to request from the Secretary an exception to the moratoria orders of the Department, and if denied relief, plaintiffs may pursue an administrative appeal through the Board of Review. Second, the Department alleges that the exhaustion doctrine should be applied in the same manner with respect to plaintiffs' contention that they are prohibited from installing and utilizing individual sewerage systems.

Regarding the first alleged ground for application of the exhaustion doctrine, the Department concedes that the appellate jurisdiction of the Board of Review is limited in this case to decisions of the Secretary which are subject to judicial review under the Maryland Administrative Procedure Act, Md. Ann. Code art. 41, § 255 (1971), which section provides:

(a) *Right to review.*—Any party aggrieved by a final decision *in a con-tested case,* whether such decision is affirmative or negative in form, is entitled to judicial review thereof under this subtitle. [Emphasis added.]

Thus, the issue before this Court is whether the Secretary's review and denial of a request for an exception to his moratoria orders does or does not involve a "contested case" within the meaning of the Maryland Administrative Procedure Act. If not, then the Board of Review has no jurisdiction to hear an appeal from the Secretary's decision and there is no available administrative remedy for plaintiffs to exhaust.

It was exactly this issue which the Court of Appeals of Maryland recently addressed in the case of *Montgomery County, Maryland v. One Park North Associates,* Md. App., 338 A.2d 892, (1975). While the principal holding of the court regarded the standing of Montgomery County to bring the appeal,[1] the Court of Appeals of Maryland clearly indicated, through the following dicta, how it would have held had the issue been properly before it:

While we must dismiss the County's appeal for lack of standing, we think it important that we indicate our disagreement with the advice given by the Secretary in his letter of October 19, 1973 to OPNA [the defendant] that an appeal to the Board [of Review] would lie from his decision denying OPNA's requested exception. As already noted, the Board's jurisdiction under § 206A is to hear and determine appeals from those decisions of the Secretary which are subject to judicial review under § 255 of Art. 41 (the Administrative Procedure Act), viz., a final decision "in a contested case." The Secretary's denial of OPNA's request for an exception from his [sewer moratorium] order of August 16, 1973, did not involve a contested case as that term is defined in § 244(c); it was not a proceeding in which OPNA's "legal rights, duties, or

---

1. Montgomery County was not a party to the original suit in the Circuit Court.

privileges . . . [were] required by law or constitutional right to be determined after an agency hearing." *See* Rules of Procedure for Hearings before the Secretary of Health and Mental Hygiene, § 10.01.02–1.

Nor does it appear that the Board obtained jurisdiction because the Secretary's decision was under § 206A, subject to judicial review under "any other provisions of law." *OPNA did not appeal to the Board from the Secretary's order of August 16, 1973; it appealed from the refusal of the Secretary on October 19, 1973 to grant an exception to his order.* Since the Secretary's letter of October 19, 1973 was not an "order" within the contemplation of Art. 43, § 404, the provisions of § 404 of Art. 43 were not implicated in OPNA's appeal to the Board, and consequently, no basis for the exercise of the Board's jurisdiction can be attributed to the provisions of that statute. Accordingly, it would appear that the Board's order was a nullity since it was without jurisdiction to enter its order of January 21, 1974. [*Montgomery County, Maryland v. One Park North Associates, supra* at 897.] [Emphasis added.]

■ On the basis of the above reasoning from the Court of Appeals of Maryland, this Court is persuaded that the Department's assertion of the doctrine of exhaustion of administrative remedies is ill-founded with regard to the alleged availability of an appeal to the Board of Review from the Secretary's denial of a request for an exception.

■ The second ground for the Department's assertion of the exhaustion doctrine regards the alleged ability of plaintiffs to apply for, install, and utilize on their private property individual sewerage systems unrelated to the WSSC system. The availability of individual sewerage systems is controlled by Md. Ann. Code art. 43, § 387C (Cum. Supp. 1974). Such private septic systems may be utilized only where they are consistent with the county comprehensive water and sewer plan. The County plan must delineate those areas where individual sewerage systems may be installed and utilized for either an interim period or for an indefinite period. Md. Ann. Code art. 43, § 387C(b) 3 (VII) and (VIII) (Cum. Supp. 1974).

Regulation 10.03.26 of the Department of Health and Mental Hygiene, adopted pursuant to Md. Ann. Code art. 43, § 387C(c), requires that the county water and sewer plan shall include all information, data, and maps necessary to:

.08A(6) Show the location of existing community sewerage systems that are currently considered adequate . . . .

.08A(7) Show where new or improved sewerage systems are now under construction or in the final planning stages.

.08A(8) Show where improvements to or construction of new community sewerage systems will be given immediate priority.

.08A(9) Delineate those areas of the county where community sewerage systems will be programmed for construction within the succeeding ten-year period.

Subsection .09 of Regulation 10.03.26 prohibits the use of the individual sewerage systems in any portion of the county delineated under .08A(6), (7), or (8). However, individual sewerage systems are permitted to be installed in any portion of the county designated under .08A(9). Thus, if an individual's land lies in an area of the county where county water and sewer planners have gone at least as far as to specify that ". . . improvements to or construction of new community sewerage systems will be given immediate priority," *id.,* .08A(8), then individual sewerage systems are not permitted. However, if the pace of development in rural portions of the county has not advanced even to a point ". . . where community sewerage systems will be pro-

grammed for construction within the succeeding ten-year period," *id.*, .08A (9), then individual sewerage systems may be permitted.

Plaintiffs allege that the above limitations in the Montgomery County ten-year water and sewer plan on the right to install and utilize private septic systems constitute a deprivation of plaintiffs' properties without just compensation and without due process in violation of the fifth and fourteenth amendments of the United States Constitution. Defendant Department of Health and Mental Hygiene argues that, before this issue can be raised in this Court, plaintiffs must exhaust available administrative remedies by requesting the appropriate officials of Montgomery County to amend the water and sewer plan to permit the use of an individual sewerage system at a particular location.

Such a request would appear to involve a reclassification of a parcel of land from a .08A(8) to .08A(9) designation, *supra*. The Department alleges that, should Montgomery County fail to so reclassify a particular parcel of land, plaintiffs should be required to request that the Secretary of the Department, pursuant to a recently acquired authority,[2] amend the Montgomery County plan. Should the Secretary fail to reclassify plaintiffs' land, it is argued that plaintiffs must then seek review of the Secretary's decision by way of appeal to the Board of Review.

The ingenuity of this argument is matched only by its myopia. The comprehensive plan is the tool whereby design and rationality can replace the chaotic sprawl which has too often characterized metropolitan development. If plaintiffs, and others similarly situated, were allowed to petition administratively for a reclassification of their land, the Montgomery County comprehensive plan would soon be riddled with the same types of exceptions and variances which

have crippled the efficacy of local zoning ordinances as salutary tools for the guidance of development.

Beyond the shortsightedness of the Department's argument, this Court finds the case law cited by the Department to be inapposite to their exhaustion argument. The Department relies almost exclusively on an unreported case from the Court of Special Appeals of Maryland, *Commissioners of Poolesville v. County Council of Montgomery County and the Department of Health and Mental Hygiene*, Md. App., 330 A.2d 711 (1975). In that case, the municipality of Poolesville, Maryland sought an amendment to the Montgomery County water and sewer plan to allow the discharge of 600,000 gpd (gallons per day) of sewage in lieu of the 250,000 gpd authorized by the county plan. Poolesville brought an action in the Circuit Court for Montgomery County against both the County and the Department of Health and Mental Hygiene alleging that it was harmed by the County's failure to enlarge the limitation on the municipality's maximum daily sewage effluent, as specified in the County plan, from 250,000 gpd to 600,000 gpd. The Circuit Court dismissed the suit for failure of Poolesville to exhaust administrative remedies available before the Board of Review. The Court of Special Appeals affirmed the Circuit Court, stating at page 714 of the 330 A.2d as follows:

The State, acting through the Department, has elected to control growth, at least to the extent that such growth adversely affects water and sewage disposal. The Legislature, however, did not leave municipalities devoid of a remedy. Municipalities may seek redress before the Department and, finally, if necessary, before the courts.

We think Poolesville must comply with Md. Ann. Code art. 41, § 206B *et seq.* and exhaust its administrative remedies before it can seek a judicial

2. The Department of Health and Mental Hygiene recently acquired the authority to "make a revision" in the county plan. Md.

Ann. Code art. 43, § 387C(d)2, effective July 1, 1974.

review. As we see it, Poolesville is an aggrieved party within the meaning of Md. Ann. Code art. 41 by virtue of the Department's action of March 6, 1973 approving the Montgomery County Council's Resolution No. 7-1020, the amendment to the ten year water and sewage plan.

While it would appear from the above passage that the Secretary's decision to approve a county water and sewer plan can create "a contested case" within the meaning of the Maryland Administrative Procedure Act, thereby making available to parties aggrieved by the Secretary's decision an appeal to the Board of Review, these facts do not equate with the Department's argument that, with regard to prohibitions on the use of individual sewerage systems, plaintiffs in the instant case have an available administrative remedy which must be exhausted before seeking judicial relief. The *Poolesville* case is inapposite to the case at bar for two reasons.

First, in *Poolesville*, the plaintiff municipality made a direct challenge to the Secretary's decision to approve the county water and sewer plan, and was thereby found to be an aggrieved party within the meaning of the Maryland Administrative Procedure Act. In the instant case, as in the case of *Montgomery County v. One Park North Associates, supra,* the challenge which plaintiffs would make, should exhaustion of administrative remedies be required, would be indirect in that it would only be the Secretary's decision not to review the classification of plaintiffs' land in the comprehensive water and sewer plan, which classification prohibits use of individual sewerage systems, that would go before the Board of Review. Such a decision by the Secretary to deny a request for an exception is identical to the issue addressed in *One Park North Associates, supra,* wherein the Court of Appeals of Maryland indicated that the Board of Review has jurisdiction to hear only direct appeals from orders of the Secretary, but not to hear indirect appeals from the refusal of the Secretary to grant an exception to one of his prior decisions:

> OPNA did not appeal to the Board from the Secretary's order of August 16, 1973; it appealed from the refusal of the Secretary on October 19, 1973 to grant an exception to his order. [*Montgomery County v. One Park North Associates, supra* at 898.]

Following the above indication from the Court of Appeals of Maryland, it appears that the Board of Review would lack jurisdiction to hear plaintiffs' request for review of a decision by the Secretary denying an exception to the classification of plaintiffs' land which Montgomery County had made in the comprehensive water and sewer plan. If the Board of Review would lack jurisdiction to hear plaintiffs' grievance then clearly there is no available administrative remedy to be exhausted.

Second, the Court notes the implied distinction which state law creates between individuals and municipalities with regard to their respective standing to influence amendments or revisions to the county water and sewer plan. Md. Ann. Code art. 43, § 387C(b) 1, (I) provides:

> (b) *Adoption of county plans; subsidiary plans; contents of plans.*—1. (I) The governing body of each county shall, adopt and submit to the Department, a county plan dealing with water supply systems and sewerage systems no later than January 1, 1970, and a complete county plan dealing also with solid waste disposal systems and solid waste acceptance facilities no later than January 1, 1974; and shall from time to time submit amendments or revisions of such plan, as it deems necessary or as may be required by the Department provided said governing body shall give notice to the principal elected official of any municipal corporation concerned, who shall be granted an opportunity to be heard with respect to such plans, amendments or revisions, and after

said governing body has given reasonable opportunity for a public hearing to be held thereon.

Under the above provision, it is only the municipalities, and not individuals, who are afforded the traditional due process safeguards of notice and opportunity to be heard prior to amendments or revisions of the county plan. This fact strongly indicates that it was not the intent of the legislature to endow individuals with standing to challenge the wisdom of land use designations made by the county plan. Such a legislative intent is, of course, consistent with the policy considerations previously outlined by this Court. Individuals should not be permitted to riddle the comprehensive plan, and the regional best interest served thereby, with exceptions tailored to their private concerns.

Thus, this Court finds that the doctrine of exhaustion of administrative remedies cannot be applied to prevent plaintiffs from seeking judicial relief at this time.

## FIFTH AMENDMENT CHALLENGE

■ Plaintiffs allege that various actions of the defendants have deprived plaintiffs of their property without due process and without just compensation in violation of the fifth and fourteenth amendments of the United States Constitution. At the outset, it is important to make a distinction which has been totally overlooked in the pleadings of this case. The fifth amendment provides:

No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

The fifth amendment employs two independent clauses to address two independent issues. Contrary to the allegations of the amended complaint, a claim of *deprivation* of property without due process cannot be blended as one and the same with the claim that property has been *taken* for public use, without just compensation.

The allegations which plaintiffs make under the fifth amendment regard three separate situations, which will be addressed by this Court in the following order: the continuing presence of the sewer service moratorium; the prohibition on the use of private septic systems; and the imposition on properties abutting WSSC sewer lines of a front-foot benefit surcharge notwithstanding that these properties are unable to connect to the WSSC sewer system.

### I. The Moratoria Orders

The May 20, 1970 moratoria orders issued by the Department of Health and Mental Hygiene represent an exercise of the police power of the state. The power of the Department to issue the moratoria orders derives from Md. Ann. Code art. 43, § 388, which provides:

The Department of Health and Mental Hygiene shall have general supervision and control over the waters of the State, insofar as their sanitary and physical condition affect the public health or comfort; and it may make and enforce rules and regulations, and order works to be executed, to correct and prevent their pollution. It shall investigate . . . all points of sewage discharge. It shall examine all existing public water supplies, sewerage systems and refuse disposal plants, and shall have power to compel their operation in a manner which shall protect the public health and comfort . . . . .

The essential question for determination by this Court is whether the Department's exercise of the police power through its various sewer moratoria orders constitutes either a taking of private property without just compensation or a deprivation of property without due process. The "taking" issue shall be examined first.

### A. Taking Without Just Compensation

Following the language of Justice Holmes in the famous case of *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393,

43 S.Ct. 158, 67 L.Ed. 322 (1922), it has often been said that the difference between the exercise of the police power and the power of eminent domain is a matter of the degree of damage to the property owner:

It is true the line between police power and condemnation has not been and perhaps cannot be sharply drawn. The problem is really one of degree. In both, damages may result but if the damage is such as to be suffered by many similarly situated and is in the nature of a restriction on the use to which land may be put and ought to be borne by the individual as a member of society for the good of the public safety, health or general welfare, it is said to be a reasonable exercise of the police power, but if the damage is so great to the individual that he ought not to bear it under contemporary standards, then courts are inclined to treat it as a "taking" of the property or an unreasonable exercise of the police power. [*Stefan Auto Body v. State Highway Comm.,* 21 Wis. 2d 363, 369–70, 124 N.W.2d 319, 323 (1963) ].

■ While constructive takings, and not just actual takings, may be actionable under the fifth amendment where governmental regulation has imposed an excessive restriction on the use of land, a further distinction, articulated by Professor Freund in his well-known work, The Police Power, § 511, at 546–47 (1904), must be noted:

It may be said that the state takes property by eminent domain because it is useful to the public, and under the police power because it is harmful. . . . From this results the difference between the power of eminent domain and the police power, that the former recognizes a right to compensation, while the latter on principle does not.

As stated by the Court in *Just v. Marinette County,* 56 Wis. 2d 7, 16, 201 N. W.2d 761, 767, 3 ELR 20167, 20168 (1972):

*Thus the necessity for monetary compensation for loss suffered to an owner by police power restriction arises when restrictions are placed on property in order to create a public benefit rather than to prevent a public harm.* [Emphasis added.]

■ In the instant case, the sewer-service moratoria orders of the Department of Health and Mental Hygiene constitute an attempt, not to create a public benefit, but to prevent a public harm to the natural character of the waters of the state. In their natural state, the streams and rivers of Prince George's and Montgomery Counties are unpolluted. Through the public trust doctrine, the State of Maryland has the duty of preserving the natural, unpolluted condition of these waterways. In a legal sense, the various moratoria orders, designed to prevent further overflows of raw sewage into the streams and rivers of the state, serve not to secure a benefit, but to remedy a public harm which the state long ago had the duty to address.

Thus, this Court finds that the sewer moratoria orders are not manifestations of the state's power of eminent domain. Rather, the moratoria orders constitute an exercise of the police power within Professor Freund's classic definition, *i. e.,* prevention of a public harm, not promotion of a public gain. Accordingly, plaintiffs are not entitled to compensation under the taking clause of the fifth amendment.

Additionally, it is noted that plaintiffs' claim for relief under the taking clause is ill-founded even if this Court were to look only at the degree of the restriction on plaintiffs' use of their land. As indicated by the Court in *Steel Hill Development, Inc. v. Town of Sanbornton,* 469 F.2d 956, 963 (1st Cir. 1972), under the modern test, no taking arises under the fifth amendment unless the property has been rendered worthless or useless.

As the district court found, appellant still has the land and buildings for

which it paid $290,000. The estimated worth, had Steel Hill's original plans been approved, is irrelevant. Though the value of the tract has been decreased considerably, it is not worthless or useless so as to constitute a taking. *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S. Ct. 143, 60 L. Ed. 348 (1915); *Sibson v. State,* 111 N.H. 305, 282 A.2d 664 (1971).

 In the instant case, several of the plaintiffs plan to subdivide their land into small, single-family lots, a use which will clearly generate a greater volume of sewage than other possible residential or commercial uses to which these plaintiffs could profitably put their respective properties. Montgomery County and WSSC have adopted policies which give low priority to the applications of these conventional homebuilders vis-a-vis other commercial or residential applications for sewer hookups as additional treatment capacity becomes available during the interim period. In the view of this Court, such allocation policies are rationally related to the legitimate purpose of alleviating sewage overflows while simultaneously affording sewer service to the greatest number of persons and land uses. By selecting a different, less profitable use for their land than single-family subdivisions, these plaintiffs can expedite the availability of sewer service to their properties. Under these circumstances, it cannot be said that a taking has occurred. *Hadacheck v. Sebastian, supra; Sibson v. State, supra.*

In addition, this Court notes that the moratorium on sewer service is a temporary, not a permanent restriction. When the moratorium is lifted, plaintiffs will be in an advantageous position to reap high profits from the seller's market which will prevail in the subdivision-housing industry. Under these facts as well, it cannot be said that plaintiffs' land has been rendered " . . . worthless or useless so as to constitute a taking." *Steel Hill Develop-*ment, Inc. v. Town of Sanbornton, supra* at 963.

**B. Deprivation Without Due Process**

 In addition to the allegations of a taking without just compensation, the amended complaint asserts that the various sewer moratoria have deprived plaintiffs of their property without due process, in violation of the fifth amendment of the United States Constitution. While the police power of the state establishes in elected officials an extremely broad authority to promote the health, safety, morals and general welfare of the public, the means used to achieve these objectives must be reasonable. *Just v. Marinette County, supra.* Restrictions imposed by local governments acting under authority of the police power can constitute a deprivation of property without due process where the police power is exercised in an arbitrary or unreasonable manner.

> *The police power of a state is an indispensable prerogative of sovereignty and one that is not to be lightly limited. Indeed, even though at times its operation may seem harsh, the imperative necessity for its existence precludes any limitation upon its exercise save that it be not unreasonably and arbitrarily invoked and applied.* [*Miller v. Board of Public Works,* 195 Cal. 477, 484, 234 P. 381, 383 (1925) ]
> [Emphasis added.]

In the instant case, the reasonableness of the Secretary's sewer moratoria orders must be measured on two separate grounds. The Court must examine the various orders to determine whether they are both reasonable as to purpose and reasonable as to duration.

*1. Purpose of the Moratoria Orders*

 The legitimacy of the state's purpose in protecting its waters from contamination by sewage overflows requires little discussion. The lesson of history is clear; it is reasonable, if not essential, that the state act to prevent

the pollution of its waters by human wastes and the epidemics of disease which flourish under such conditions. Accordingly, the courts have found no deprivation of property without due process where potentially unsanitary sewer conditions have led local officials to impose severe restrictions, including limitations on minimum lot size, on the use of private property. *Garvin v. Baker,* 59 So. 2d 360 (Fla., 1952).

While promotion of the health of the community is certainly a permissible objective, it is important to examine whether the sewer moratoria orders have been implemented for the primary purpose of achieving other objectives which are not permissible. In particular, plaintiffs allege that the moratoria on sewer hook-ups remain in force in order to implement a tacit no-growth policy adopted by local officials in portions of Prince George's and Montgomery Counties. It has been held that local governments may not use police power regulations " . . . to avoid the increased responsibilities and economic burdens which time and natural growth invariably bring." *National Land and Investment Co. v. Kohn,* 419 Pa. 504, 528, 215 A.2d 597, 610 (1965). "The implication of our decision in *National Land* is that communities must deal with the problems of population growth. They may not refuse to confront the future by adopting zoning regulations that effectively restrict population to near present levels." *Concord Township Appeal,* 439 Pa. 466, 474, 268 A.2d 765, 768 (1970). *Accord, Board of County Supervisors of Fairfax County v. Carper,* 200 Va. 653, 107 S.E.2d 390 (1959).

 While it is true that local governments "may not refuse to confront the future," *Concord Township Appeal, supra,* by broad and unfounded prohibitions on growth, it is equally well established that development demand may properly be impeded where growth restrictions are imposed pursuant to well-reasoned, comprehensive plans for the improvement of the physical infrastructure of the region. *Matter of Golden v. Planning Bd. of Town of Romapo,* 30 N.Y.2d 359, 334 N.Y.S.2d 138, 285 N.E.2d 291 (1972), *appeal dismissed,* 409 U.S. 1003, 93 S. Ct. 440, 34 L. Ed.2d 294 (1972). In Maryland, the courts have expressly upheld the use of sewer service restrictions as a tool to accomplish staged development and to guide growth within the limits of the comprehensive plan. *Norbeck Village Joint Venture v. Montgomery County Council,* 254 Md. 59, 254 A.2d 700 (1969).

In the instant case, plaintiffs rely heavily on the case of *Belle Harbor Realty Corp. v. Kerr,* 43 A.D.2d 727, 350 N.Y.S.2d 698 (1973), wherein revocation of building permits on the ground of grossly inadequate sewer service in the area was held to constitute a deprivation of property without due process. A closer reading of the case, however, reveals that the lack of any comprehensive plan for the improvement of the sewer system was the critical factor in the court's decision:

Shortly thereafter, however, respondents notified petitioner that the prior approval was being revoked on the basis of a report prepared by respondents which indicated that the sewer system in the area, built before 1889, was "grossly inadequate" for current neighborhood needs and that addition of even one-family residences to the area would sharply increase the occurrence of sewage back-ups. Respondents indicated that plans were being made to consider a new sewer system for the area and that two other previously issued approvals had also been revoked because of inadequacy of the sewer system. *There was no indication in that notice of when, if ever, the improvement plans would be finalized and construction of a new sewer system undertaken.*

. . . Refusal to issue the approval and permits under these circumstances would constitute a deprivation of property without due process of law. . . . Unlike the situation in *Mat-*

*ter of Golden v. Planning Bd. of Town of Ramapo,* 30 N.Y.2d 359, 369, 334 N.Y.S.2d 138, 144, 285 N.E.2d 291, 296, *the lack of facilities here had no relation to any community plan; nor does it appear that there are any comprehensive plans for the improvement of the sewer system in the area to accommodate the structures for which it is zoned.* [*Belle Harbor Realty Corp. v. Kerr, supra,* 43 A.D.2d at 727–28, 350 N.Y.S.2d at 700.] [Emphasis added.]

In the instant case, as outlined in the statement of facts, *supra,* all of the various sewer moratoria orders have been accompanied by extensive and detailed plans of the steps which are being or will be taken to improve wastewater treatment capacity in Prince George's and Montgomery Counties. Interim as well as long-range plans have been adopted for most of the watershed basins. The Washington Suburban Sanitary Commission, together with state and local officials, has actively pursued the implementation of these plans. Under these circumstances, it cannot be said that the moratorium on sewer service has been effected for the improper purpose of restricting from Prince George's and Montgomery Counties, Maryland's fair share of metropolitan Washington regional growth. Accordingly, this Court can find no deprivation of property without due process with regard to the purpose of the sewer moratorium.

### 2. Duration of the Moratoria Orders

As indicated at the outset of the present discussion, no deprivation of property without due process will be found where the police power has been exercised in a reasonable manner, and the reasonableness of the moratoria orders in the instant case must be measured with regard to their duration as well as their purpose. The application of both of these tests was indicated by the United States Court of Appeals for the First Circuit, in the case of *Steel Hill Development, Inc. v. Town of Sanbornton,* 469 F.2d 956, 962 (1st Cir. 1972), wherein the court upheld a six acre minimum lot size restriction which had been imposed by a small New Hampshire town in the face of a private developer's plan to more than double the town's year-round population by constructing a large, seasonal, second-home community within the township:

> On reviewing the record, we have serious worries whether the basic motivation of the town meeting was not simply to keep outsiders, provided they wished to come in quantity, out of the town. We cannot think that expansion of population, even a very substantial one, seasonal or permanent, is by itself a legitimate basis for permissible objection. Were we to adjudicate this as a restriction for all time, and were the evidence of pressure from land-deprived and land-seeking outsiders more real, we might well come to a different conclusion. Where there is natural population growth it has to go somewhere, unwelcome as it may be, and in that case we do not think it should be channelled by the happenstance of what town gets its veto in first. But, at this time of uncertainty as to the right balance between ecological and population pressures, we cannot help but feel that the town's ordinance, which severely restricts development, may properly stand for the present as a legitimate stop-gap measure.

As stated previously in the instant case this Court does not have the "serious worries" of the *Sanbornton* Court regarding the basic motivation for the sewer moratorium. However, this Court does share with the First Circuit a concern for the duration of such a restriction on growth. While local governments may properly impose a moratorium on development for police power purposes, such a moratorium must be reasonably limited as to time. In the view of this Court, the language of the Court in *Belle Harbor Realty Corp. v.*

*Kerr, supra,* 43 A.D.2d at 728, 350 N.Y. S.2d at 701, provides the appropriate starting point for a due process evaluation of the duration of the moratoria orders in the instant case:

However, as in Westwood Forest Estates *(supra)* [23 N.Y.2d 424, 297 N.Y.S.2d 129, 244 N.E.2d 700], it should be made very clear that the city is not entirely without remedies. We cannot permit appellant to contribute to a situation which would subject the residents of Belle Harbor to unlimited dangers to health and safety, in the form of accumulating filth and sewage. To paraphrase language from the Westwood Forest Estates case (23 N.Y.2d at 428–429, 297 N.Y.S.2d at 133, 244 N.E.2d at 702–703):

> "This is not to say that [the city] may not, pursuant to its other and general police powers, impose other restrictions or conditions on the granting of a building permit * * * or perhaps even *a moratorium on the issuance of any building permits, reasonably limited as to time*" (bracketed matter and emphasis added).

Such restraint must be imposed only as necessary. It may not "prevent permanently the reasonable use of private property" *(id.,* at 429, 297 N.Y.S.2d at 133, 244 N.E.2d at 703).

Accordingly, while we are reversing the judgment and ordering the issuance of the subject approvals and permits, we suggest that the city may impose a reasonable moratorium on construction in the area until the sewers can be expanded to accommodate the area's needs. However, if the city does choose to impose a moratorium, but then fails to remedy the sewerage problem with dispatch, property owners could, if so advised, sue to compel such remedial action, as well as for any damages which might have resulted from the city's failure to perform its duty. [Emphasis added.]

While a police power moratorium must be reasonably limited as to time, it is clear that the reasonableness of the duration of the moratorium must be measured by the scope of the problem which is being addressed. The time which is reasonable for remedial action by officials of Sanbornton, N.H. or Belle Harbor, N.Y. is different from the time which is reasonable for resolution of a problem affecting Virginia and the District of Columbia as well as the Washington Suburban Sanitary District within Prince George's and Montgomery Counties, Maryland. The scope of the police power and the permissible duration of its exercise must expand to meet the increasingly complex problems of metropolitan, multi-jurisdictional government. As stated by the California Supreme Court in *Miller v. Board of Public Works, supra,* 195 Cal. at 484, 234 P. at 383:

> In short, the police power, as such, is not confined within the narrow circumspection of precedents, resting upon past conditions which do not cover and control present day conditions obviously calling for revised regulations to promote the health, safety, morals, or general welfare of the public; *that is to say, as a commonwealth develops politically, economically, and socially, the police power likewise develops, within reason, to meet the changed and changing conditions.* . . . [Emphasis added.]

The current moratorium on sewer hook-ups in Prince George's and Montgomery Counties originated five years ago with the May 20, 1970 orders of the Secretary of the Department of Health and Mental Hygiene. This Court holds today that the five-year duration of the Secretary's sewer moratoria orders is reasonable in view of the scope of the sewer problem confronting metropolitan Washington. The following paragraphs address some of the facts which have persuaded the Court in reaching this conclusion.

First, it must be recognized that the entire sewer scenario in metropolitan Washington has been played out against the backdrop of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 *et seq.* (1970) [hereinafter "FWPCA"]. Section 208 of the Act provides that the Governor of each state shall designate "a single representative organization . . . capable of developing effective area wide waste treatment management plans" for "each area within the State, which, as a result of urban-industrial concentrations or other factors, has substantial water quality control problems." 33 U.S.C. § 1288 (a)(2). The FWPCA provides for federal funding of up to seventy-five percent of the construction costs of wastewater treatment works, provided, however, that there is a federally approved water quality planning organization, pursuant to the Governor's Section 208 designation, capable of administering the federal funds.

It was only in March, 1975, that the Metropolitan Council of Governments was designated as the Section 208 regional water quality planning agency for Northern Virginia, the District of Columbia and the Prince George's and Montgomery County portions of Maryland. While it has been possible during the moratorium period for WSSC to receive some federal funding under the old, pre-1972 Federal Water Pollution Control Act, 33 U.S.C. § 1251 (1970), the impounding of federal water quality improvement funds by the Nixon administration, together with the area-wide regional planning requirements of Section 208 of the FWPCA, are facts of which this Court must take judicial notice in evaluating the reasonableness of the duration of the moratoria orders. Certainly, it would have been unreasonable for WSSC to repudiate the availability of 75% federal funding under the FWPCA and proceed to make major commitments of Maryland resources to waste treatment projects which lacked the approval of the Section 208 regional water quality

planning organization for metropolitan Washington. Evidence of the regional planning and federal funding problems is provided by WSSC Resolution No. 72–041, May 31, 1972, p. 4, Amended Complaint Exh. I, wherein it was noted that planning and site selection for additional regional waste treatment plants:

. . . have not proceeded to a point where Federal officials (the Environmental Protection Agency) are agreeable to determining that there is a specific program of adequate sewage treatment facilities in the metropolitan Washington region capable of handling the flows which will develop in excess of those which the expanded (309mgd) Blue Plains Treatment Plan can treat, and absent such Federal determination the Commission is unable to obtain necessary EPA approvals for grants, or to obtain necessary Federal permits for traversing Federal lands, where applicable, for heretofore planned relief sewers and other augmenting aspects of its systems in the Anacostia, Cabin John, Rock Creek, Seneca, Muddy Branch and other drainage basins . . . .

Second, this Court recognizes that the duration of the sewer moratorium in metropolitan Washington is in large measure a function of the inter jurisdictional complexity of the problem. In October, 1970, the District of Columbia, WSSC, and Fairfax County, Virginia, executed a Memorandum of Understanding regarding expansion of the Blue Plains regional waste treatment plant from its 1970 capacity of 240 mgd to a capacity of 309 mgd. According to the agreement, primary treatment of the enlarged 309 mgd capacity was to be available by 1973, secondary treatment was to be available by 1974, and advanced waste treatment was to be available by 1977. The District of Columbia assumed responsibility for construction of the enlarged plant, while the Maryland and Virginia jurisdictions agreed to finance the construction in proportion to the share of the additional capacity

which they would utilize. It was anticipated that the proposed expansion of the Blue Plains plant would meet all of WSSC's needs at least through 1977.

One example of the inter-jurisdictional nature of the metropolitan Washington sewer problem is indicated by WSSC Resolution No. 72–041, *supra* at pp. 4–5, wherein it was stated:

> . . . the rate of flow in the Cabin John Basin in January-February, 1972 was approximately 11 mgd, and absent the Federal grant approval for the heartofore planned WSSC Cabin John relief sewer (the application for which has been pending since May 4, 1970), and absent District of Columbia action to provide the temporary connection of the WSSC Cabin John sewer to the Potomac [Dulles] Interceptor Sewer, the request for which was made on April 27, 1970 pursuant to the District of Columbia—WSSC Potomac Interceptor Sewer Agreement, the WSSC Cabin John sewer was experiencing daily overflows in the magnitude of approximately 0.3 mgd, which indicated that measures should be taken to limit further service connections and hookups in that basin until a relief sewer and/or connection with the Potomac Interceptor Sewer can be accomplished . . . .

As indicated by the above language, WSSC has sought from the District of Columbia since 1970 performance of a contractual agreement to connect Cabin John sewage flows to the Potomac Interceptor sewer, also known as the Dulles Interceptor sewer. Originating in Virginia and crossing the Potomac River at a point north of the District of Columbia, the Dulles Interceptor sewer runs south along the Maryland side of the river, through Georgetown within the District of Columbia, and down to the Blue Plains plant on the southern side of Washington. As part of WSSC's agreement with the District of Columbia, it was intended that sewage from the Cabin John watershed basin of Montgomery County would feed into the Dulles Interceptor and eventually reach the Blue Plains plant. However, between 1970 and 1974, the Georgetown portion of the Dulles Interceptor, known as the Georgetown gap, remained incomplete, with the consequence that raw sewage overflowed into the Potomac from the Cabin John basin during this period. The District of Columbia maintained that the Georgetown gap, the connecting link between the Dulles Interceptor and the Blue Plains plant, could not be completed until there was a resolution of the Three Sisters Bridge controversy, a fiercely contested transportation dispute regarding completion of the interstate highway I–66 from Virginia into the District of Columbia via a crossing of the Potomac at Georgetown. As a consequence of these delays, WSSC brought suit against the District of Columbia in order to expedite both completion of the Georgetown gap and lagging construction schedules for expansion of the Blue Plains plant. *WSSC v. District of Columbia,* Civil Action No. 3791–70 (D.D.C., dismissed by stipulation, January, 1973).

Although WSSC's suit against the District of Columbia was eventually resolved through negotiation, the Court takes judicial notice of the above facts because they exemplify the inter-jurisdictional complexity of the WSSC sewer problem in just one of the watershed basins. The duration of the sewer moratorium has inevitably been a function of the numerous jurisdictional interests at play in metropolitan Washington. This point was again demonstrated by proposed measures for relief of sewage overflows in the Anacostia basin, a large watershed which extends into both Prince George's and Montgomery Counties.

Since the five-year comprehensive water and sewer plan of 1968, WSSC has actively planned construction of a force main and pumping station, known together as WSSC project S89, in order to convey sewage directly from the Anacostia basin to the Blue Plains treatment

plant. The proposed Anacostia force main must necessarily traverse both the Anacostia Park, controlled by the Department of the Interior, and the Bolling Air Force Base. Throughout the first four years of the sewer moratorium, 1970–74, WSSC was unable to obtain permits for the traversing of these federal properties.

During the period of WSSC's negotiations to obtain federal permit approval for project S89, the Andrews Air Force Base, located in Prince George's County and suffering under a severe sewage disposal problem of its own, petitioned WSSC for permission to connect to WSSC's new Piscataway waste treatment plant, which went into operation during the early 1971–72 phase of the moratorium. Andrews sought access to the Piscataway plant because of the difficulties and expense which it would encounter in attempting to pump its sewage upstream to the Blue Plains plant. The new Piscataway plant, designed for an ultimate capacity of 30 mgd but currently operating at 15 mgd for reasons to be discussed hereafter, was built by WSSC to relieve its own sewage problems, not those of Andrews Air Force Base.

As a consequence of the stalemate which developed between WSSC and federal officials regarding project S89 and military access to the WSSC Piscataway plant, Montgomery County, in its Resolution No. 7–1539, December 11, 1973, p. 9, Amended Complaint Exh. P., recommended, as part of its interim program for the Anacostia basin, that WSSC consider alternative relief measures to project S89:

> *Anacostia Basin Facilities and Policies.* Relief of the most severe Anacostia basin sewerage restrictions is contingent on completion of WSSC project S89, Anacostia Force Main and Pumping Station, as approved by the Prince George's County Council for inclusion in the WSSC FYS 1974–79 Capital Improvements Program, and provisions of adequate

treatment capacity at the Blue Plains STP [sewer treatment plant].

> The County Council therefore urges the immediate construction of these projects. *The County Council recognizes the inter jurisdictional and mandatory review difficulties involved with the implementation of S89,* and therefore urgently requests that the WSSC promptly report on the possibilities of constructing in the Anacostia basin a temporary surge facility for temporary retention of peak sewage flows to prevent overflows. . . . [Emphasis added.]

While it now appears that most of the federal permits prerequisite to construction of project S89 have been obtained, this development has only occurred in 1975, following the September, 1974 contract between WSSC and the Department of Defense, whereby WSSC consented to grant Andrews Air Force Base access to the new Piscataway treatment plant.

The 15 mgd limitation on the capacity of the Piscataway plant arises from a water quality determination by the interjurisdictional Potomac River Enforcement Conference that marine life in the Piscataway Bay cannot be sustained if the Bay must receive a volume of treated effluent greater than 15 mgd. Thus; the condition for operation of the Piscataway plant at 30 mgd is the construction of an outfall line directly into the main stem of the Potomac, thereby bypassing the Piscataway Bay. While such an outfall line would double the capacity of the Piscataway plant and enable it to operate as a truly regional waste treatment center, i. e. sufficient capacity to easily accommodate Andrews Air Force Base, construction of the outfall line will necessarily pass through and cause disruption to the federally owned Piscataway Park, famous for the irreplaceable relics of the Piscataway Indian heritage in that area. Consequently, it was only in June, 1975, and after considerable controversy, that the Department of the Interior gave final

approval for construction of the outfall sewer line which will traverse Piscataway Park and connect the Piscataway waste treatment plant directly to the Potomac River.

In view of all the foregoing facts and the indication which they provide of the complex inter-jurisdictional problems which have plagued resolution of the sewer crisis, this Court is convinced that the duration of the moratoria orders challenged in the instant case has been entirely reasonable. The exhibits which plaintiffs have appended to their Amended Complaint provide a history of the sewer moratorium in metropolitan Washington. On the basis of these documents and the preceding discussion, this Court finds that the various moratoria orders on sewer hook-ups in Prince George's and Montgomery Counties constitute an exercise of the police power which has been reasonable with regard to both purpose and duration. Accordingly, plaintiffs have suffered no deprivation of due process under the fifth amendment of the United States Constitution.

### II. Private Septic Systems

As previously indicated in the discussion on exhaustion of administrative remedies, the availability of individual sewerage systems is controlled by Regulation 10.03.26 of the Department of Health and Mental Hygiene, adopted pursuant to Md. Ann. Code art. 43, § 387C(c). Plaintiffs allege that these regulations constitute a deprivation of their property without due process in violation of the fifth and fourteenth amendments of the United States Constitution.

Initially, this Court notes that it is disinclined to follow the recent holding of the Circuit Court for Frederick County, Maryland, wherein Judge Shure held Regulation 10.03.26 to be void for vagueness. *Moyer v. Solomon*, Equity No. 25,344 (decided June 11, 1975). Subsections .08A(6–10) and .09 of Regulation 10.03.26 prohibit the use of private sep-

tic systems in those portions of the comprehensive water and sewer plan for the county which:

.08A(6) Show the location of existing community sewerage systems that are currently considered adequate. . . .

.08A(7) Show where new or improved sewerage systems are now under construction or in the final planning stages.

.08A(8) Show where improvements to or construction of new community sewerage systems will be given immediate priority.

Private septic systems are permitted in those portions of the comprehensive water and sewer plan for the county which:

.08A(9) Delineate those areas of the county where community sewerage systems will be programmed for construction within the succeeding ten year period.

.08A(10) Delineate those areas of the county where community sewerage systems are not reasonably foreseeable or will not be programmed for construction during the succeeding ten year period.

All of the designations described in subsections .08A(6–10) of the Regulation are to be made for Prince George's and Montgomery Counties by planning officials within WSSC prior to being submitted to the respective county governments for approval.

In the view of this Court, the above limitations on the use of private septic systems constitute a proper and reasonable exercise of the police power of the state which does not suffer from such a lack of clarity or definition as to be constitutionally void. This Court is unable to share Judge Shure's sentiment that the phrases "immediate priority," "now under construction," or "final planning stages," create unconstitutional ambiguities in the Regulation.

These phrases are terms of art within the planning profession. The Regulation requires only that the areas conforming to these classifications be shown or delineated on the comprehensive water and sewer plan. The private developer is not called upon to determine the meaning of the phrases in the Regulation, but only to follow the classification which the plan has assigned to his land. Under these circumstances, it cannot be said that the Regulation is so vague as to be constitutionally void.

Regarding the legitimacy of the purpose of Regulation 10.03.26, the Regulation itself clearly sets forth in the preamble the objectives and policy considerations which underlie the restrictions which the State of Maryland has imposed on the use of private septic systems:

> In developing the county plan, consideration shall be given to related aspects of zoning, population estimates, engineering and economic factors, and other State, regional, municipal, and county plans. . . . Likewise, the plan shall identify those places where wastewater can be accommodated with least interference with water uses and with reasonable treatment and disposal costs. *The objective of the county plan is to guide the development of the ultimate water supply-sewerage system consistent with population growth and economic development so that . . . wastewater may be collected and delivered to points where conditions are best suited for waste discharge, and treated and disposed of to minimize adverse effects on legitimate water uses.* [Emphasis added.]

Like the commonplace zoning ordinance, Regulation 10.03.26 was designed as a tool to guide growth to the end that neither environmental quality nor economic efficiency would be compromised as water and sewer services expanded throughout the county. The use of water and sewer regulations as tools to plan for and achieve orderly, rational de-velopment has received approval from the Maryland courts. In an explicit reference to the statute at issue in the instant case, Md. Ann. Code art. 43, § 387C, the Court of Special Appeals of Maryland recently noted with approval that "[t]he State, acting through the Department [of Health and Mental Hygiene], has elected to control growth, at least to the extent that such growth adversely affects water and sewage disposal." *Commissioners of Poolesville v. County Council of Montgomery County and the Department of Health and Mental Hygiene, supra* at 714.

An even more explicit approval of the use of sewerage regulations as a tool to plan for orderly growth comes from the Court of Appeals of Maryland in the case of *Norbeck v. Montgomery County,* 254 Md. 59, 62–64, 254 A.2d 700, 703–04 (1969), wherein the Maryland National Capital Park and Planning Commission rezoned, with the approval of the court the town of Olney, Maryland in order to achieve a satellite, low density community of 29,000 persons.

> The Plans contemplated a green belt of open spaces and parks to shield the Olney area from the ever-lengthening and over-crowding suburban sprawl coming out of Washington, and changed the zoning designation of appellants' land, some 183 acres in the southeast quadrant along the east side of Georgia Avenue, from R–R (half acre lots) to R–A (two acre lots), as it did some 12,000 other acres. . . . A public hearing was held on October 17, 1966 on E–928. Officials of MNCPPC and of the County Citizens Planning Association offered extensive testimony in support of the application and it also was supported by the technical staff of the Planning Commission . . . .. The appellants [aggrieved developers] presented several experts to refute the concepts of the Master Plan urging in essence that the prior policy of allowing all the small houses that the ever-increasing population of the County would

buy or rent be allowed in the Olney area, which would lead to a population of some 200,000 despite the conceded inadequacy of sewerage and roads.

. . .

. . . . . .

A purpose of the Plan was described as promoting the physical isolation of Olney from suburban sprawl. Low density residential zoning was recommended to break the development pattern from the suburbs. The proposed zoning in the plan is in accordance with existing development. It was stated that a serious deficiency of public services would exist if the Master Plan was not adopted. The plan was to accomplish a staged development using the tools of zoning and sewer access to avoid the excess costs of public services. A critical element of the Plan was to encourage earlier growth along the 70S corridor rather than on the Patuxent River Watershed thereby protecting the basin from pollution. Hewins did point out that cluster development of the R–A zone could be served by sewers, but the District Council reserved the power to approve these applications separately as a tool to guide growth within the desired limits.

In the view of this Court, policy considerations similar to those outlined above by the Court of Appeals of Maryland serve to uphold Regulation 10.03.26 from constitutional attack under the due process clause of the fifth and fourteenth amendments.

Additionally, it must be noted that if plaintiffs were to prevail in their attack on the constitutional validity of Regulation 10.03.26 it would be a pyrrhic victory. As stated in the Regulation itself, *supra,* "[t]he objective of the county plan is to guide the development of the ultimate . . . sewerage system consistent with population growth and economic development so that . . . wastewater may be collected and delivered to points where conditions are best suited for waste discharge . . . ."

One of the major impediments to the resolution of the sewer crisis in metropolitan Washington has been the random geographic location of those watershed basins receiving the greatest development pressure. Five out of six of the land-owning plaintiffs in the instant action hold property in either the Cabin John or the Anacostia watershed basins. Resolution of the sewer crisis in both of these watershed basins has, as a consequence of geographic location, necessitated complex, expensive, and time-consuming projects to link burgeoning sewage flows with the Blue Plains plant, i. e. WSSC project S89 for relief of Anacostia sewage overflows and completion of the Dulles Interceptor sewer main through the Georgetown gap for relief of Cabin John sewage overflows.

If this Court were to hold that Regulation 10.03.26 restricts too greatly the kind of land area within which private septic systems may be utilized, then private development would be permitted to build new communities at random throughout the county, irrespective of the engineering, environmental, and economic inefficiencies occasioned by haphazard, unplanned growth. *See* Note, 41 G.W. Law Rev. 604 (1973). The original imposition and the continuing duration of the present sewer moratorium in Prince George's and Montgomery Counties have been a function of such unforeseen inefficiencies. In effect, the planning component of Regulation 10.-03.26 is the safeguard against the reappearance of new sewage overflows and further sewer-service moratoria in years to come.

### III. Front Foot Benefit Assessments

The Washington Suburban Sanitary Commission imposes upon all properties abutting a WSSC sewer line a front foot benefit assessment, based on lot footage contiguous to the WSSC line, in order to amortize bonds issued for construction of water and sewer lines within the Washington Suburban Sanitary District. The authority for such assessments de-

rives from the benefit to the property owner of a hook-up with the WSSC line. Hence, Section 5–1(d) of the WSSD Code provides for a hiatus in the imposition of the front foot benefit charge for those properties which cannot obtain service from the WSSC line:

> The commission may further provide for a hiatus in the imposition and collection of a front foot benefit assessment for any property otherwise assessable with respect to a sanitary sewer line which property cannot in the judgment of the commission obtain service from the sewer pipe upon which the benefit would be based. . . . The suspension of the benefit charge shall terminate at any time a connection with the commission's sewer pipe or water main, as the case may be, is made by the owner of the property . . . . .

Plaintiffs allege that the above hiatus provision should apply to exempt from the front foot benefit assessment all those properties which are unable to hook up to an existing WSSC line as a consequence of the sewer moratorium.

It should be noted that the hiatus provision only postpones, but does not alter, the rate and duration of the assessment which will eventually be imposed when a connection is sought to the WSSC line. Section 5–1(d) of the WSSD Code further provides:

> When the exemption or suspension condition is no longer applicable pursuant to the provisions hereof which established the exemption or suspension, any land or *property* exempted from or *with respect to which there is a suspension of front foot benefit charges, shall* be classified for benefit charge assessment purposes, in its then current class, and *become liable to a benefit assessment charge at a rate and for a period of time the same as properties first classified or assessed in that year but not less than the rate and number of years which would have applied at the time of ex-*

*emption or suspension.* [Emphasis added.]

Thus, in the long run, it appears that WSSC's solvency to redeem the bonds issued for construction of water and sewer lines will not be jeopardized by application of the hiatus provision.

In response to plaintiffs' allegations, WSSC states that the procedures utilized by the Commission in applying the hiatus provision of Section 5–1(d) require, first, that the property owner must apply for the exemption from the front foot benefit assessment and, second, that the application for such relief must be made at the time of the original notice that an assessment is to be levied against the property. In the view of this Court, the second of these two procedures violates the due process clauses of the fifth and fourteenth amendments.

On February 24, 1975, WSSC filed a motion for partial summary judgment with respect to the procedures for implementing the hiatus provision of Section 5–1(d), wherein it was stated:

> We must, in all candor, advise the Court that the Defendant Commission does not have the statutory authority to invoke the "hiatus" provision once an assessment has been levied and the property owner has commenced payment thereof. Therefore, it becomes incumbent upon the affected property owners to apply to the Commission for appropriate relief, pursuant to Section 5–1(d), *supra,* upon notice that an assessment is to be levied against their property.

A close reading of Section 5–1(d) of the WSSD Code convinces this Court that the statute itself is silent with regard to WSSC's authority to invoke the hiatus provision once an assessment has been levied. The requirement that an exemption be applied for contemporaneously with notice of the assessment appears to result from WSSC's creative interpretation of the hiatus provision rather than from actual limitations on WSSC's statutory authority.

In the view of this Court, it is inconsistent with basic notions of fair play and due process to say that a person whose property was assessed by WSSC in 1968 cannot apply for and receive in 1972 an exemption from the front foot benefit charge as a result of the Secretary's 1970 moratoria orders, which orders could not reasonably have been anticipated in 1968. Where properties have been assessed by WSSC subsequent to the inception of the moratorium, it is likewise unreasonable to say that relief from the front foot benefit charge must have been applied for, if at all, at the time of the original assessment; property owners may reasonably have believed at the time of the original assessment that the sewer moratorium would soon terminate, thereby obviating the need to apply for an exemption from the front foot benefit charge. Consequently, this Court finds that the procedures which WSSC has adopted for administration of Section 5–1(d) of the WSSD Code are not supported by the statute itself, nor are they consistent with the due process safeguards of the fifth and fourteenth amendments of the United States Constitution.

For all of the reasons stated above, it is, this 18th day of August, 1975, Ordered:

1. That the motions to dismiss of defendants Prince George's County, Montgomery County, and the Department of Health and Mental Hygiene be, and the same hereby are, Granted, as a consequence of plaintiffs' failure to state a claim upon which relief can be granted;

2. That the motion for partial summary judgment of defendant Washington Suburban Sanitary Commission on the issue of front foot benefit assessments is, Denied;

3. That plaintiffs' motion for partial summary judgment on the issue of front foot benefit assessments be, and the same hereby is, Granted, to the end that the Washington Suburban Sanitary Commission must adopt and give adequate notice of procedures whereby any property owners within the Washington Suburban Sanitary District who are presently deprived of the benefit of sewer service by reason of the various orders imposing moratoria on hook-ups to Washington Suburban Sanitary Commission sewer lines may, pursuant to Washington Suburban Sanitary District Code, Section 5–1(d), apply for and receive at any time an exemption from the imposition of the front foot benefit assessment;

4. That with regard to all other relief requested by plaintiffs, the motion to dismiss of defendant Washington Suburban Sanitary Commission is, Granted, for the reasons set forth in this opinion.