UNITY VENTURES, et al., Plaintiffs,

v.

COUNTY OF LAKE, et al., Defendants.

No. 81 C 2745.

United States District Court,
N.D. Illinois, E.D.

March 19, 1986.

James P. Chapman, Alan Mills, Robert J. Zaideman, James P. Chapman & Associates, Ltd., Chicago, Ill., for plaintiffs.

Fred L. Foreman, State's Atty. of Lake County by Clifford L. Weaver, Gerald P. Callaghan, Waukegan, Ill., for defendants Lake County, George Bell, and Norman Geary.

Clifford L. Weaver, William Freivogel, Robert C. Newman, Kathryn A. Knue, Diana C. White, Burke, Bosselman, Freivogel, Weaver, Glaves & Ryan, Chicago, Ill., for all defendants.

Phillip Areeda Cambridge, Mass., of counsel, to all defendants as to Antitrust Issues only.

## MEMORANDUM ORDER

BUA, District Judge.

Before the Court is the defendants' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. For the reasons stated herein, the motion for a judgment n.o.v. is granted, and the motion for a new trial is denied.

## I. INTRODUCTION

Unity Ventures, LaSalle National Bank, and William Alter brought this suit for damages and injunctive relief against Lake County, Illinois, The Village of Grayslake, Illinois, the members of the Lake County Board, individually and as board members, Edwin M. Schroeder, as mayor of Grayslake, and the trustees of the Village of Grayslake. Plaintiffs alleged that defendants conspired to prevent the development of Alter's land by a series of wrongful acts, including denying access to sanitary sewer service, in violation of plaintiffs' rights under the due process and equal protection clauses of the Fourteenth Amendment and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

All claims, except for those based on procedural due process, were tried to a jury. On January 12, 1984, the jury returned a verdict in favor of the plaintiffs and against the defendants for $9,500,000 on the antitrust claim and on the civil rights claim. The verdict on the antitrust claim was trebled and the Court entered judgment in favor of the plaintiffs in the amount of $28,500,000. Thereafter, the defendants filed a timely motion for j.n.o.v. or, in the alternative, for a new trial.

## II. FACTS

In 1972, plaintiffs obtained an option to purchase approximately 585 acres of farmland ("the Unity property") in a then unincorporated portion of Lake County. The Unity property is located directly south of Grayslake and southeast of the then existing boundaries of Round Lake Park. On August 15, 1976, Alter entered into an annexation agreement with Round Lake Park providing for the development of Unity. By the terms of the agreement, Round Lake Park adopted an ordinance annexing the Unity property and in return received contributions of land and money for municipal facilities. On October 21, 1976, Alter exercised his option to purchase and acquired title to the property.

At the time that Alter and Round Lake Park were engaged in plans for annexation and development of Unity, Lake County was preparing to replace the existing sewage systems by constructing a countywide sanitary sewer system with a network of "interceptors" (large trunk or main sewer lines). Central Lake County was to be served by two principal interceptors. One, known as the Northeast Central Interceptor, was to provide service from Grayslake and communities along its path to a new treatment plant in Gurnee, Illinois. The other, known as the Northwest Central Interceptor, was to provide trunk service to Round Lake Park and communities along its path to a new treatment plant in Fox Lake, Illinois. Under grants approved by the Illinois Environmental Protection Agency (IEPA), and by the terms of the revenue bond issue and regional plans for the construction of the Interceptor, Unity was in an area designated to be served by the Northeast Interceptor.

On April 20, 1976, Grayslake entered into an agreement with Lake County for sewage disposal whereby the County was to provide service to Grayslake through the Northeast Interceptor. Pursuant to this agreement, Grayslake was granted a "sphere of influence" that included areas of Lake County outside the boundaries of Grayslake, over which Grayslake had the right to approve all connections to Lake County's Northeast Interceptor. The pertinent part of the agreement provided:

> The County shall preserve the function of County interceptors located within the sphere of influence of the Village (as delineated in Exhibit "A" attached hereto and made a part hereof) by not permitting any direct connection hereto by any person, firm, corporation or municipality unless the Village consents in writing to such direct connection.

(Pl.Ex. 30, p. 8.)

The 1976 agreement contained two changes over the previous sewage disposal agreement executed in 1973 between Grayslake and the County: the addition of the Unity property and Heartland property to Grayslake's sphere of influence and the addition of the word "municipality" in the

paragraph cited above. These changes brought the Unity property and development within Grayslake's sphere of influence and, thus, Grayslake had control over any connection of sanitary sewer service from Unity to the Northeast Interceptor. Neither plaintiffs nor the officials of Round Lake Park knew of the sphere of influence agreement between Grayslake and Lake County until October 1978.

In August 1978, Alter prepared and submitted to the Lake County Public Works Department two plans for the proposed construction of a connection between Unity and the Northeast Interceptor. The first plan provided for the construction of a connection which would serve only Unity, the cost of which would be borne by Alter. The second plan provided for the construction of a connection which would serve not only Unity but also an area lying between Unity and Grayslake, known as the Heartland development, which Grayslake was contemplating annexing.

On August 23, 1978, these plans were submitted to Martin Galantha, Director of the Lake County Public Works Department. In a letter dated September 25, 1978 to Mayor Schroeder, Galantha described the plans:

[A]lthough most of Round Lake Park is to be provided sewer service as part of the Northwest regional system, the Unity Venture development lies within the Des Plaines River basin and therefore, should be tributory to the County's Northeast Central interceptor system.

(Pl.Ex. 50, p. 1.) Galantha approved of the plans and sent them to Mayor Schroeder for Grayslake's approval pursuant to the sphere of influence agreement.

On October 31, 1978, plaintiffs met with Mayor Schroeder, Galantha, Walter Bengson, Mayor of Round Lake Park, and others to discuss the proposed sewer connection to the Northeast Interceptor. At this meeting, Alter learned of the sphere of influence agreement. Mayor Schroeder told Alter that Grayslake would not consent to Unity connecting to the Northeast Interceptor at that time.

On March 16, 1979, the Public Service Committee of the Lake County Board obtained a legal opinion from the law firm of Chapman & Cutler about the propriety of Grayslake's veto power under the sphere of influence agreement. (Pl.Exs. 147 and 148). In particular, Chapman & Cutler advised the Board:

Due process of law requires that intelligible standards be provided to guide the recipient of a delegation of power.... However, the Agreement vests the Village with entirely arbitrary authority and therefore, could be held void in whole or in part....

(Pl.Ex. 113, p. 2).

Chapman & Cutler also suggested that Grayslake's veto might violate the antitrust laws insofar as the veto power was not per se immune under the state action doctrine as applied to the antitrust laws. Defendants Geary, Schroeder and Bell objected to the Public Service Committee after it asked the State's Attorney what it should do about the veto and the sphere of influence agreement. (Pl.Exs. 112, 111 and 149, respectively.) Finally, the Public Service Committee agreed to drop any further inquiry into the legality of Grayslake's veto and directed that "the County should take whatever action may be required to support the validity of this contract." (Pl.Ex. 130.)

Since it appeared that the County would not provide sewer service to the Unity property via the Northeast Central Interceptor, plaintiffs and Round Lake Park prepared plans for construction of a sewage treatment plant for Unity. In November 1979, they obtained a needed variance from the Illinois Pollution Control Board without objection after a recommendation from the IEPA. This order was not appealed to the Illinois Appellate Court. In December 1979, Round Lake Park and a sewer company created for this purpose executed an agreement for construction of the facility.

Meanwhile, the Heartland property had been the subject of a proposed development and annexation by Grayslake for several

years. In November 1980, because Grayslake had not proceeded with the annexation, the developer of Heartland sought annexation by Round Lake Park. On December 22, 1980, the Grayslake Board of Trustees passed and tendered to Round Lake Park a resolution providing that Grayslake would agree to the sewer connection of Unity to the Northeast Interceptor if Round Lake Park would agree to engage in the mutual planning of Heartland and to refrain from annexing Heartland without the approval of Grayslake. On January 3, 1981, Round Lake Park rejected the Grayslake resolution and on January 14, it passed a resolution authorizing the annexation of Heartland. Thereupon, the trustees of Grayslake unanimously rescinded their resolution which provided for the conditional connection of Unity with the Northeast Interceptor.

After Heartland requested annexation to Round Lake Park, Lake County and Grayslake filed with the IEPA objections to the construction of the sewage treatment plant for Unity. On June 3, 1981, the defendants filed an action in the Circuit Court of Lake County challenging the validity of Heartland's zoning and annexation by Round Lake Park. On May 15, 1981, this action was filed. On January 22, 1982, this Court denied defendants' motion to have it abstain from ruling in this action. On March 22, 1982, defendants amended their action in the Circuit Court of Lake County to add allegations that Round Lake Park's zoning of plaintiffs' property was invalid.

### III. DISCUSSION

The defendants in this case are requesting this Court to grant their motion for judgment notwithstanding the verdict based on their allegation that the jury's verdict was not supported by substantial evidence. The Seventh Circuit recently articulated the standard for determining whether a judgment n.o.v. should be granted: "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party against whom the motion is directed." *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1213 (7th Cir. 1985). In reviewing the record, this Court must resolve all conflicts in the evidence in favor of the plaintiff, and may not judge the credibility of the witnesses. *LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1410 (7th Cir.1984).

### A. ANTITRUST IMMUNITY

#### 1. *The Local Government Antitrust Act of 1984*

The Local Government Antitrust Act of 1984, P.L. No. 98–544, 130 *Cong. Rec.* H11850–51 (daily ed. Oct. 10, 1984) ("the Act") prohibits damages from being entered against local governments for violations of the Clayton Act (15 U.S.C. §§ 15, 15a or 15c). The Act, which became effective September 10, 1984, is not retroactive unless specific conditions are met.

Defendants claim that this case meets the conditions necessary to trigger retroactive application of the Act, even though a jury verdict had been rendered prior to the passage of the Act. The plaintiffs contend that the Act does not apply retroactively to this case; an argument which, if successful, might enable the $28.5 million verdict to stand.

#### (a) *Language of the Act*

The language of the Act and the Conference Report is plain. Section 3(a) of the Act creates an immunity from damages:

No damages, interest on damages, costs, or attorneys' fees may be recovered under Section 4, 4A, or 4C of the Clayton Act (15 U.S.C. §§ 15, 15a, or 15c) from any local government, or official or employee thereof acting in an official capacity.

But under Section 3(b), this immunity is not retroactive: "Subsection (a) shall not apply to cases commenced before the effective date of this Act"—unless stringent conditions are met:

[U]nless the defendant establishes and the court determines, in light of all the circumstances, including the stage of liti-

gation and the availability of alternative relief under the Clayton Act, that it would be inequitable not to apply this subsection to a pending case. In consideration of this section, existence of a jury verdict, district court judgment, or any stage of litigation subsequent thereto, shall be deemed to be *prima facie* evidence that [the immunity] shall not apply.

The October 10, 1984 Conference Report explains this language as follows:

The application to pending cases of ... section 3 will be based upon a case-by-case determination by the district court. The local government has the burden of proof to establish to the court's satisfaction that it would be inequitable not to apply [immunity] to the pending case. The court is to consider all relevant circumstances. The statute mentions two of the factors that the court should consider—stage of the litigation and the availability of alternative relief under the Clayton Act. Where a pending case is in an early stage of litigation and where injunctive relief can remedy the problem, the defendant local government may be able more easily to sustain its burden. Where a case is in more advanced stages of litigation or where injunctive relief is unavailable or incomplete, the burden would become more difficult. If a case has progressed to or beyond a jury verdict or district court judgment, *a local government defendant would need compelling equities on its side* to justify the application of [immunity] to the pending case. (Emphasis added).

### (b) *Application of the Act*

■ In this case, which has progressed beyond a jury verdict, Congress has placed the burden of proof on the defendants to show "compelling equities." The defendants must rebut the *prima facie* evidence that the Act shall not apply. They have failed to meet this burden.

Defendants cite four cases which discuss the retroactive application of the Act. *TCI Cablevision, Inc. v. Jefferson City*, 604 F.Supp. 845 (W.D.Mo.1984); *Jefferson Disposal Co. v. Parish of Jefferson*, 603 F.Supp. 1125 (E.D.La.1985); *Bates v. City of Kansas City*, No. 83-1331-CV-W-3, slip op. (W.D.Mo., Feb. 7, 1985); *Town of St. Cloud v. City of St. Cloud*, No. 6-84-164, slip op. (D.Minn., Dec. 16, 1984). However, none of these cases considers the application of the Act to a case in which a jury verdict had already been rendered. The defendants, in fact, present no evidence to rebut the statutorily-created *prima facie* evidence of a jury verdict. They cite no persuasive authority on which this Court should deviate from a straight-forward interpretation of the language of the Act. Under that language, this case clearly does not necessitate the retroactive application of the Act.

The jury verdict for this case was rendered in January 1984, long before this Act was passed. The verdict will stand because the defendants have failed to meet their burden of proving that compelling equities necessitate the retroactive application of the Act.

Since the retroactive application of the Act is being decided on the basis of the stage of litigation, it is not necessary to consider whether or not alternative relief is available under the Clayton Act.

### 2. *State Action Doctrine of Immunity*

Defendants allege that the plaintiffs have failed to state a claim on the ground that the defendants' governmental activities were immune from antitrust challenge under the state action doctrine. Accordingly, defendants assert that they are entitled to judgment n.o.v. or, in the alternative, a new trial.

■ Exemption for anticompetitive actions by state governments was established by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The Supreme Court in *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413, 98 S.Ct. 1123, 1137, 55 L.Ed.2d 364 (1978) extended the *Parker* exemption to local government units acting "pursuant to state policy to displace compe-

tition with regulation or monopoly public service." Before it will be exempt from antitrust challenge, the activity must be supported by state policy which is "clearly articulated and affirmatively expressed." *City of Lafayette*, 435 U.S. at 410, 98 S.Ct. at 1135; *Community Communications Company v. City of Boulder*, 455 U.S. 40, 51, 102 S.Ct. 835, 840, 70 L.Ed.2d 810 (1982).

Most recently, the Supreme Court has upheld the "clearly articulated state policy" test in *Town of Hallie v. City of Eau Claire*, —— U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). This decision fully considers how clearly articulated a state policy must be in order for a municipality to establish that its anticompetitive conduct constitutes state action. *Id.* 105 S.Ct. at 1717. Furthermore, *Town of Hallie* provides this Court with a standard for analyzing the Illinois statutes at issue in the present case.

In *Town of Hallie*, four towns surrounding the City of Eau Claire alleged that the City conditioned the provision of sewage treatment, over which it had a monopoly, upon a property owner's agreement to annex his property to the City. The towns alleged that this condition constituted a tying arrangement in violation of the Sherman Act. The Supreme Court affirmed the dismissal of the towns' claim, holding that the City of Eau Claire's actions reflected a "clearly articulated and affirmatively expressed" state policy to permit municipalities to condition the provision of sewage treatment upon an agreement to annex.

*Town of Hallie* established that, to pass the "clear articulation" test, a state statute must "clearly contemplate that a city may engage in anticompetitive conduct." *Id.* at 1718. The legislature, however, need not expressly have stated in either a statute or its legislative history that it intended for the action to have anticompetitive effects. *Id.* at 1719.

The Wisconsin statutes in *Hallie* provided that a city may: 1) define the area to be served by its sewer system [Wis.Stat. § 62.18(1)(1982)]; 2) fix the limits of such service in unincorporated areas [Wis.Stat. Ann. § 66.069(2c)(Supp.1984); and 3) refuse to serve an area which refuses to annex to the city [Wis.Stat.Ann. § 144.-07(1m)(Supp.1984)]. Thus, the Wisconsin statutes specifically authorized the City of Eau Claire to use its monopoly power over sewage treatment to force property owners to annex to the City as a condition of obtaining sewage service. *Town of Hallie*, 105 S.Ct. at 1718.

In analyzing the plain meaning of the statutes, the Supreme Court held that "the statutes clearly contemplate that a city may engage in anticompetitive conduct. Such conduct is a foreseeable result of empowering the City to refuse to serve unannexed areas." *Id.*

Recently, the Seventh Circuit Court of Appeals addressed the issue of state action immunity in a case involving similar, if not identical, facts to the present case. *La-Salle National Bank v. County of Du-Page*, 777 F.2d 377 (7th Cir.1985). In *LaSalle National Bank*, plaintiffs' complaint alleged that the County and the Villages of Woodridge and Lisle violated antitrust laws by agreeing to a formula for allocating new sewage connections among themselves in response to IEPA (Illinois Environmental Protection Agency) charges that the consolidated County treatment plants were processing too much waste. The formula was apparently first contained in the two agreements which effected the consolidation of the ownership and management of all sewage treatment facilities in the County. As a part of the consideration for turning over ownership of their own treatment plants to the County, the Villages each reserved the right to a certain number of new connections in the event sewage treatment supply in the County became scarce. The Seventh Circuit also noted that "[a]mong the provisions in the sales agreements was one reserving for each Village the right to determine which users outside the Village would receive sewage treatment service from the sewage treatment plant the Village was selling to the County." *Id.* at 379.

The Seventh Circuit then discussed the applicable Illinois statutes to "first deter-

mine whether any state legislative act(s) authorizes the challenged conduct and then determine whether anticompetitive effects are a foreseeable result of the authorization." *Id.* at 381. In light of the succinct analysis by the Seventh Circuit, this Court will excerpt the relevant portions thereof:

> The State of Illinois authorizes counties and municipalities to contract together and combine resources for the provision of sewage treatment. Ill.Ann.Stat. ch. 34, ¶ 3111 (Smith-Hurd 1985 pocket part) (counties "may furnish ... sewerage service ... to municipal corporations ... [and] may enter into and perform contracts ... with any municipal[ity], ... for the furnishing ... of ... sewerage service"); Ill.Ann.Stat. ch. 24, ¶ 11–147–4 (Smith-Hurd 1962) ("Any municipality lying wholly or partly within the boundaries of any county which accepts the provisions of 'An Act in relation to water supply, drainage, sewage, pollution and flood control in certain counties,' [Ill. Ann.Stat. ch. 34, ¶ 3101–3123] may contract with such county for water supply or sewerage service to or for the benefit of the inhabitants of the municipality"); Ill.Ann.Stat. ch. 111½, ¶ 1046(b) (Smith-Hurd 1977) ("in order to be eligible for federal grants for construction of sewage works pursuant to Section 201(g) of the Federal Water Pollution Control Act Amendment of 1972 (P.L. 92–500), any municipality, county, special district or other unit of local government ... that owns or operates sewage works may adopt ... ordinances or regulations to provide for systems of proportionate cost sharing for operation and maintenance by recipients of such unit's waste treatment services.").[ ] The legislature has also expressly authorized the IEPA "to engage in planning processes and activities and to develop plans in cooperation with units of local government ... in connection with the jurisdiction or duties of each such unit...." Ill.Ann.Stat. ch. 111½, ¶ 1004(n) (Smith-Hurd 1977).

*Id.* at 381–82.

The defendants cite to this Court the exact same Illinois statutes and the Court can only conclude that they apply here, as in *LaSalle National Bank*, to authorize the type of agreement entered into between Lake County and the Village of Grayslake. As in *LaSalle National Bank*, the agreement here was entered into for the prupose of allocating sewage connections between individual municipalities in Lake County and the County itself. The municipalities stopped using their individual treatment plants and agreed to have all of their sewage treated by the County through a series of Interceptors to be built by the County. The goal of these agreements was to provide uniform sewage treatment for the entire County. In exchange, the municipalities received a right to determine which users outside of their boundaries would receive sewage treatment service under the new County-wide system.

The Court concludes that, as in *LaSalle National Bank*, the relevant Illinois statutes authorize counties and municipalities to contract together and combine resources for the provision of sewage treatment. *Id.* at 381. The Court further concludes that the agreement between Lake County and Grayslake, including the "sphere of influence" provision for determining which users outside Grayslake's boundaries would receive sewage treatment, fell within the authorized cooperation between municipalities and counties found in the Illinois statutes in *LaSalle National Bank.*

Turning to the second part of the Seventh Circuit's analysis, the Court again excerpts the relevant portions of *LaSalle National Bank:*

> We think it clear that the Illinois statutory scheme which encourages local units of government to cooperate among themselves and with the IEPA in the provision of sewage treatment evinces legislative appreciation of the tension between intergovernmental competition for economic development and pollution control goals, and implicitly sanctions reduced intergovernmental competition.

In sum, free competition and competitive pricing are not the policies underlying the Illinois scheme for sewage treatment. Rather the scheme is one in which local governmental units are encouraged to cooperate in providing sewage service to residences within their boundaries for the common good of the communities they serve. These local and regional decisions regarding sewage treatment are guided by political forces, minimal judicial review, *see Krol v. County of Will,* 38 Ill.2d 587, 590 [233 N.E.2d 417] (1968), and state and national environmental protection laws. Under such a scheme anticompetitive effects are clearly foreseeable and contemplated.

*Id.* at 382. Finally, in *LaSalle National Bank,* the Seventh Circuit concluded that "the defendants' agreement allocating sewage treatment capacity was authorized and that the Illinois legislature intended that such cooperative agreements not be the subject of federal antitrust suits." *Id.*

■ In the present case, the Court finds the analysis and result in *LaSalle National Bank* controlling. As it noted above, the Court has already found that the agreement between Grayslake and Lake County was authorized by the same Illinois statutes present in *LaSalle National Bank.* Therefore, it follows that the Court reaches the same conclusion as the Seventh Circuit did in *LaSalle National Bank:* that the Illinois legislature intended that the cooperative agreement between Grayslake and Lake County not be the subject of federal antitrust suits since anticompetitive effects are clearly foreseeable under the legislative scheme for sewage treatment. Accordingly, the Court holds that the doctrine of state action immunity under the antitrust laws applies here to the local government's alleged violative conduct. Since the state action doctrine under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) applies, the jury's verdict and award for the federal antitrust action must be vacated and the action dismissed.

## B.  ANTITRUST LIABILITY

Even if the state action doctrine does not apply in this case, the Court finds that the jury verdict and award was not supported by the evidence produced at trial. The plaintiff alleged and the jury found that defendants had violated § 1 of the Sherman Act, 15 U.S.C. § 1, through their participation in a contractual agreement which restrained trade within a specific relevant market. *Unity Ventures v. County of Lake,* No. 81 C 2745 (N.D.Ill. January 12, 1984). The Court must now analyze the jury's findings in light of the elements necessary to support the antitrust verdict.

■ The Sherman Act was designed to protect competition within specific markets. *See M.C. Mfg. Co., Inc. v. Texas Foundries, · Inc.,* 517 F.2d 1059, 1064 (5th Cir. 1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976). Section 1 states: "Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States ... is declared illegal...." 15 U.S.C. § 1. A violation of the Sherman Act is proven by a "showing that the agreement in question results in a substantial foreclosure of competition in ... a relevant market." *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center,* 684 F.2d 1346, 1350 (7th Cir. 1982); *U.S. Trotting Association v. Chicago Downs Association, Inc.,* 665 F.2d 781, 790 (7th Cir.1981) (en banc). Furthermore, the burden of proof for the elements of a violation is on the plaintiff. *Dos Santos,* 684 F.2d at 1350.

### 1.  *Contract, Combination or Conspiracy*

The plaintiff alleges that defendants participated in a contract, combination or conspiracy which resulted in anticompetitive effects. To prove this allegation, plaintiff entered into evidence a written contract executed by Grayslake and Lake County. (Pl.Ex. 30). The contract, which was reviewed by the jury, conferred upon Grayslake the exclusive right to provide or withhold sewage disposal services within a

specified geographic area. This area included the plaintiff's property.

■ The existence of the contract establishes beyond dispute that defendants intended to, and in fact did, participate in a contractual agreement which gave Grayslake the right to restrain plaintiff's access to sewage disposal services. The Sherman Act, however, does not in and of itself forbid or restrain the power of parties to enter into contracts. *U.S. v. Reading Co.*, 226 U.S. 324, 33 S.Ct. 90, 57 L.Ed. 243 (1912). It is only when the contract results in injury to competition in a relevant market that a violation occurs. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *U.S. Trotting Association*, 665 F.2d at 790.

## 2. *Relevant Market*

■ The determination of a relevant market establishes the scope of competition within which the effect of an alleged restraint is to be evaluated. The importance of accurately establishing a relevant market is important because any violation of the federal antitrust laws must be appraised in light of a relevant market. *U.S. v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 385 (9th Cir.1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979).

■ A relevant market consists of both a product market and a geographic market. *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962); *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). A relevant *product* market includes products which are interchangeable, as determined by whether or not the products can be functionally substituted and by how small a price increase would cause a consumer to switch to a substitute product. *du Pont*, 351 U.S. at 404, 76 S.Ct. at 1012. A relevant *geographic* market consists of the area in which the parties compete for the sale of the products that form the relevant product

market. *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

Thus, a plaintiff must present evidence of the substitutability of products and the area of competition in order to prove relevant product and geographic markets. In the instant case, plaintiff attempted to establish two relevant markets: one involving competition among developers for the sale or lease of residential, light industrial and commercial properties in Western Lake County; and one involving competition among municipalities for the annexation of developable land in Central Lake County. Each will be analyzed to determine whether there was sufficient evidence to support the jury's finding that a relevant market existed.

### (a) *Residential, Light Industrial and Commercial Property*

The plaintiff alleged that the relevant product markets are 1) residential properties and 2) light industrial and commercial properties. Specifically, the plaintiff testified that he intended to build detached single-family homes, attached manor homes and townhouses, and multiple unit apartment buildings. (Tr. 739–44, 996). The homes, manor homes and townhouses would range in price from $40,000 to $60,000 each. The plaintiff also intended to sell residential lots for between $9,000 and $10,500 apiece. (Tr. 745–46, 997, 1121). Evidence was also heard that the plaintiff expected to compete with sellers of new as well as used homes. (Tr. 1130).

To establish the existence of a relevant market for these products, the plaintiff would have to present sufficient evidence for the jury to be able to determine the scope of competition within the market as well as the functional substitutability of the products. *du Pont*, 351 U.S. at 395, 76 S.Ct. at 1007. The plaintiff has failed in this duty.

■ The plaintiff did not offer sufficient evidence on the volume of new or used home sales in the applicable price

range and time frame in Western Lake County. There was evidence on the volume of used home sales, for example, but the data didn't cover Western Lake County, as defined by plaintiff. There was testimony on the number of residential building permits granted, but no indication of how many of these permits resulted in a new home actually being built, or of what type of residential building was being built. Nor did plaintiff offer sufficient evidence on apartment leases in the relevant area. Thus, the jury would not have been able to determine which residential properties could have been functional substitutes for the plaintiff's planned properties.

Similarly, plaintiff did not present sufficient evidence regarding the scope of the light industrial or commercial properties market in Western Lake County. The plaintiff's booklet of data on industrial developments in Lake County as a whole (Pl.Ex. 120–B) did not address itself to which developments were located in Western Lake County, or which developments would have competed with the plaintiff's proposed developments, with regard to either use or price. There was also no evidence on the number of already existing light industrial buildings which would compete with plaintiff's proposed buildings. Therefore, the booklet did not prove the scope of the light industrial properties market, and it supplied no evidence whatever about the relevant commercial properties market.

Plaintiff has also failed to establish Western Lake County as the relevant geographic market for residential, light industrial and commercial property. The boundaries of a relevant geographic market must be drawn to include the area to which potential buyers could turn to obtain the product, which in this case is residential, light industrial and commercial property. *Tampa Electric*, 365 U.S. at 327, 81 S.Ct. at 628. In determining the appropriate geographic market, plaintiff should employ "a pragmatic, factual approach ... and not a formal, legalistic one." *Brown Shoe*, 370 U.S. at 337, 82

S.Ct. at 1530. Therefore, the criteria to be used in defining the relevant geographic market are "essentially similar to those used to determine the relevant product market." *Id.*

As we have discussed above, plaintiff has produced insufficient evidence of the volume of new and used homes sold in Western Lake County in any price range during any time period. Moreover, there is no evidence that Western Lake County, defined by plaintiff as the portion of Lake County which lies west of the Tollway, is the area in which potential home buyers would shop for homes. Trial testimony indicated that plaintiff expected potential home buyers to be drawn from throughout Lake County, Northern and Northwestern Cook County and perhaps DuPage County, as well as from other states. (Tr. 772, 1138). Surely, many of these potential customers would be looking for competing homes in areas other than Western Lake County.

It is also unreasonable to assume that corporations seeking light industrial or commercial property would limit their search to Western Lake County. There is no evidence that Western Lake County is a separate market. In fact, trial testimony indicated that plaintiff's proposed light industrial development would directly compete with similar space on the east side of the Tollway.

The Court concludes that Western Lake County as an area does not conform to the commercial realities of shopping for residential, light industrial and commercial property. As such, it is an economically insignificant geographic area and is, therefore, inaccurately defined.

(b) *Annexation of Developable Land*

Plaintiff also alleged that a relevant market existed among municipalities for annexable, developable land in Central Lake County. Plaintiff's argument is that the annexation of developable land is a market transaction whereby both parties benefit. Through annexation, a municipality gains the exclusive right to provide certain services to a development's residents in ex-

change for a right to levy fees and taxes. In return, a developer receives favorable zoning and an assurance that essential services will be provided by the municipality.

■ While the annexation of developable land is perhaps not typical, similar markets for services have been recognized by the courts as product markets. In *City of Lafayette v. Louisiana Power & Light Co.*, for example, a municipality was charged with improperly attempting to tie the sale of water to the sale of electricity. 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). The relevant product market in the case was the provision of municipal services. Similarly, in *U.S. v. Philadelphia National Bank*, the Court determined that the relevant product market within which to review allegedly anticompetitive bank mergers was the provision of commercial banking services. 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963). The Court agrees with plaintiff's contention that annexable, developable land could constitute a relevant product market.

■ In asserting that annexable, developable land is the relevant product market in this case, however, plaintiff must still produce evidence regarding the functional interchangeability of developable land. *du Pont*, 351 U.S. at 395, 76 S.Ct. at 1007. In other words, plaintiff must prove that a market exists whereby municipalities compete to annex reasonably interchangeable parcels of developable land. The Court finds that the plaintiff has failed in this proof.

The record contains no substantial evidence or thorough analysis of factors essential to establishing a relevant market such as the number of municipalities competing within the alleged market, total volume of the product in the market area (i.e. how many other parcels were available at that time and were these parcels "reasonably interchangeable"), or the portion of the market that was affected by the defendants' agreement. Without evidence on these factors, the jury could not have reasonably determined the existence of a relevant market under the *du Pont* test of

"commodities reasonably interchangeable by consumers." 351 U.S. at 395, 76 S.Ct. at 1007.

■ Plaintiff has also failed to establish a relevant geographic market to which municipalities could reasonably turn to annex developable land. A relevant geographic market should conform to the areas of effective competition and to the realities of competitive practice. *F.T.C. v. Rhinechem Corp.*, 459 F.Supp. 785, 788 (N.D. Ill.1978).

In this case, the realities of competitive practice would dictate that the municipality be very near, if not contiguous with, the annexable property so that it could conveniently and effectively render municipal services. The plaintiff's assertion of Central Lake County as the relevant geographic market could be hypothetically accurate, but, once again, there was insufficient evidence for the jury to have reached such a conclusion. Plaintiff failed to identify even approximate geographic boundaries of Central Lake County. The jury, therefore, did not know which municipalities are located within it, its size, the amount of annexable, developable property it contains or how much, if any, of the land was allegedly foreclosed from competition by the defendants' contractural agreement. In short, there was insufficient evidence to establish a relevant market for either residential, light industrial or commercial property in Western Lake County or annexable, developable land in Central Lake County.

### 3. *Injury to Competition*

■ The antitrust laws were enacted for the protection of competition, not for the protection of individual competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Therefore, plaintiff must demonstrate that the alleged conduct of defendants had some market impact, and not just an adverse effect on his business. *Sutliff, Inc. v. Donovan Cos., Inc.*, 727 F.2d 648, 655 (7th Cir.1984); *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558–59 (7th Cir.1980); *DeVoto v. Pa-*

*cific Fidelity Life Insurance Co.*, 618 F.2d 1340, 1344 (9th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980).

■ Even if a reasonable inference could be made that there is a relevant market for residential, light industrial and commercial property in Western Lake County, there is no evidence that competition within that market has been injured by defendants' conduct. Plaintiff claims that he made such a showing, arguing that defendants' conduct affected not only the plaintiff's proposed developments but also the proposed Heartland development. Plaintiff, however, presented no evidence that defendants' conduct prevented the owners of Heartland from developing their property. Nor did he offer proof that the owners of Heartland ever requested sewer service, that any of the defendants ever denied the Heartland developers sewer service, or that the defendants' conduct caused any injury to the Heartland developers.

Moreover, plaintiff did not show whether the Heartland owners intended to build the same type of residential, light industrial and commercial properties included in the plaintiff's alleged relevant product market, or how many of what type of properties the Heartland owners proposed to build. Without this information, the jury could not measure what portion of the relevant market proposed Heartland properties constituted. Further, the jury could not judge whether that portion, when added to the plaintiff's undefined portion, was a significant and substantial percentage of the alleged relevant market. *DeVoto*, 618 F.2d at 1345. The jury could not reasonably have found that defendants' conduct injured competition without knowing that percentage of the relevant market defendants' conduct affected. *Id.*

Even when the evidence is viewed in a light most favorable to plaintiff, the most plaintiff is able to show is that he has been injured. This is very different from a showing that competition within a relevant market has been injured. Plaintiff has, therefore, failed to meet the market impact

standard set forth by the Seventh and Ninth Circuits. *Sutliff,* 727 F.2d at 655; *Havoco,* 626 F.2d at 558–59; *DeVoto,* 618 F.2d at 1344.

Similarly, even if a reasonable inference could be made that there is a relevant market for annexable, developable land in Central Lake County, there is no evidence to support plaintiff's contention that there was any competition among municipalities within that market. There was no evidence that municipalities act any way but independently when they make annexation decisions. Therefore, it cannot be said that injury to competition exists when no competition at all is evident. *Indiana Federation of Dentists v. F.T.C.,* 745 F.2d 1124, 1141 (7th Cir.1984).

■ As discussed above, an alleged restraint is not illegal if it affects only a small percentage of the competition for the particular product within the relevant market. *DeVoto,* 618 F.2d at 1345. Plaintiff's assertion that there is injury to competition among developers to annex developable land in Central Lake County would, therefore, fail even if he could prove that a competitive market exists because he provided no proof as to what percentage of the market was foreclosed from competition by defendants' conduct. Furthermore, there was insufficient evidence to show that the alleged market for annexable, developable land in Central Lake County is any less efficient or that defendants' conduct altered the structure of the market in any way. *Id.* at 1346.

Plaintiff has failed to prove the requisite effect on competition in a relevant market. The jury's antitrust verdict, therefore, cannot be supported.

### 4. *Conclusion*

■ In applying the judgment n.o.v. standard set forth in *Tice v. Lampert Yards, Inc.* to the above findings, this Court is compelled to conclude that "the evidence presented, combined with all reasonable inferences permissibly drawn therefrom," is insufficient to support the verdict. 761 F.2d at 1213. The plaintiff's

failure to establish either one of two alleged relevant markets or injury to competition within those markets could have formed a sufficient basis for granting defendants' motion for judgment n.o.v. Lack of proof of either a relevant market or injury to competition within that market is sufficient grounds for defeating an antitrust claim. *Gough,* 585 F.2d at 389; *Mercantile National Bank v. Quest Inc.,* 303 F.Supp. 926, 934–35 (N.D.Ind.1969). Similarly, the assertion of an inaccurate or incorrect relevant market also defeats an antitrust claim. *Madsen v. Chrysler Corp.,* 261 F.Supp. 488, 506 (N.D.Ill.1966). In the instant case, the jury was faced with insufficient or inaccurate evidence and, therefore, could not reasonably have concluded that plaintiff established a relevant market in which trade was restrained.

Insufficient evidence regarding relevant market and injury to competition was cited as grounds for deciding a motion for judgment n.o.v. in *R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954 (M.D.Pa.1981). The plaintiff in *R.S.E.* was denied judgment n.o.v. because he presented insufficient evidence to prove that a relevant market was unreasonably affected by an alleged price-fixing technique. Similarly, in the instant case, defendants' motion for judgment n.o.v. is granted because the plaintiff presented insufficient evidence of the existence of a relevant product or geographic market, or of injury to competition within those markets.

## C. NOERR–PENNINGTON IMMUNITY

Defendants argue that their efforts to oppose the Unity property's zoning and package plant permit are shielded from antitrust liability by the *Noerr-Pennington* doctrine of antitrust immunity. Plaintiffs counter that the *Noerr-Pennington* doctrine does not apply because the lawsuit challenging plaintiffs' zoning and the objections filed with the IEPA challenging the Illinois Pollution Control Board permit for the Unity package plant are "sham" proceedings intended only to delay and injure the plaintiffs' development. Plaintiffs as-

sert that such intent to delay is evidenced by defendants' failure to vigorously pursue the zoning lawsuit.

The Supreme Court has held that bona fide attempts to influence actions of a legislative body are immune from antitrust scrutiny regardless of any anticompetitive motives behind those attempts. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1961). The Supreme Court extended *Noerr-Pennington* immunity to good faith attempts to secure legitimate goals through use of the courts in *California Motor Transport v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

The immunity from antitrust liability conferred by *Noerr-Pennington* does not extend, however, to litigation which is merely a "sham." *Id.* at 512–13, 92 S.Ct. at 612–13. In analogizing "sham" litigation to the tort of abuse of process, the Seventh Circuit Court of Appeals has stated: "The line [between protected and unprotected litigation] is crossed when [the defendant's] purpose is not to win a favorable judgment against a competitor but to harass him, and deter others, by the process itself—regardless of outcome—of litigating." *Grip-Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466, 472 (7th Cir. 1982). In a more recent case, the Seventh Circuit further defined sham litigation:

> Without a doubt, the intention to harm a competitor is *not* sufficient to make litigation ... a sham. That anticompetitive motive is the very matter protected under *Noerr-Pennington.* Rather, the prerequisite motive for the sham exception is the intent to harm one's competitors not by the *result* of the litigation but by the simple fact of the *institution* of the litigation.

*Winterland Concessions Co. v. Trela,* 735 F.2d 257, 263–64 (7th Cir.1984) (quoting from *Gainesville v. Florida Power & Light Co.,* 488 F.Supp. 1258, 1265–66 (S.D. Fla.1980) (emphasis in original)).

In the present case, the facts are very similar to those presented in *LaSalle National Bank v. County of DuPage*, 777 F.2d 377 (7th Cir.1985). In *LaSalle National Bank*, two villages were charged with violating the antitrust laws by associating together in an attempt to persuade the County Board to deny the special permit and that they did so for anticompetitive purposes. The complaint contained no intimation that the villages abused the political process in seeking to convince the county to deny the special zoning permit. *Id.* at 384 n. 6. While it decided that it did not have to reach the issue, the Seventh Circuit commented that "[t]his sort of association for purposes of influencing governmental action would appear to be exempt from antitrust challenge under *Noerr-Pennington.*" *Id.*

In this case, the plaintiffs admit that the clearest evidence of the sham litigation is the fact that the defendants waited until after this Court rejected their abstention motion to institute the state court zoning challenge, and then, took absolutely no steps to prosecute that action. If this evidence is the clearest showing sham litigation to which the plaintiffs can point, the Court finds overwhelming evidence presented by the defendants that legitimate concerns underlie the zoning lawsuit and the objections filed with the IEPA challenging the Unity package plant.

■ Both Lee and Kendig testified about public concern over where the Unity development would get sewer. Lee also testified that she told Alter that the IEPA was not favorable to package plants. Finally, the zoning lawsuit has withstood plaintiffs' motion to dismiss and there is no evidence that the defendants do not intend to pursue that lawsuit, along with numerous other villages surrounding Round Lake Park which joined in filing that action. Therefore, the Court holds that, absent any evidence that they instituted sham litigation against the plaintiffs, defendants' actions challenging the Unity property's zoning and package plant are exempt from antitrust liability under the *Noerr-Pennington* doctrine.

## D. CIVIL RIGHTS LIABILITY

Defendants argue that the evidence produced at trial fails to support the jury's verdict on the plaintiffs' equal protection and due process claims. In support of their argument, defendants assert that a violation of equal protection and due process can be found only when the challenged government action is not rationally related to a legitimate governmental objective. Defendants conclude that the denial of sewer services to Unity Ventures was rationally related to legitimate concerns about both the capacity of the Northeast Central Interceptor and the planning of the Unity Ventures and Heartland developments. Plaintiffs argue that the jury rejected both concerns when it returned a verdict of $9.5 million in plaintiffs' favor.

### 1. *Equal Protection/Due Process Analysis*

■ Under a substantive due process analysis, the general rule is that, in the absence of legislative direction, a municipality is the sole judge of the desirability and allocation of sewer services. *Wincamp Partnership v. Anne Arundel County*, 458 F.Supp. 1009, 1025 (D.Md. 1978); 11 E. McQuillin, Municipal Corporations § 31.17; 13 *id.* §§ 37.25–37.32. However, the general rule is limited by the due process clause: a county or municipal corporation must not exercise its police power in an arbitrary, unreasonable, or capricious manner. *Wincamp Partnership*, 458 F.Supp. at 1025–26. *See Moore v. East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion); *id.* at 513, 97 S.Ct. at 1942 (Stevens, J., concurring); *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Smoke Rise, Inc. v. WSSC*, 400 F.Supp. 1369, 1383 (D.Md.1975); 1 Antieau, Local Government Law § 5.18. Any exercise of that power must be substantially related to the public welfare. *Wincamp Partnership*, 458 F.Supp. at 1026.

■ This public welfare/police power analysis as applied to sewer services is consistent with substantive due process and equal protection analysis as applied to government regulation of economic rights. Absent an infringement of a "fundamental right" or the use of a "suspect classification," the rational basis test is the proper standard of review for both substantive due process and equal protection challenges to governmental action. *Chesapeake Bay Village, Inc. v. Costle,* 502 F.Supp. 213, 226 (D.Md.1980) (alleged purposeful delay of sewer services). Under the rational basis test, the state and county defendants may not exercise their authority in an arbitrary, capricious or unreasonable manner. *Id.* To be sustained, their exercise of authority must be shown to bear a rational relationship to a legitimate governmental objective. *Id.* *See Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (equal protection); *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (substantive due process).

### (a) *Legitimate Government Purpose*

In determining whether any conceivable legitimate government purpose or concern supports the denial of sewer services, the Court first examines the only three federal cases which involve the denial of sewer services alleged to violate due process and equal protection. In *Chesapeake Bay Village, Inc. v. Costle,* 502 F.Supp. 213 (D.Md. 1980), the plaintiff alleged that the state and county defendants used grossly inaccurate population projections in connection with proposals submitted to the United States Environmental Protection Agency (EPA). The EPA subsequently denied the County a grant for a sewage treatment plant large enough to meet the anticipated needs of the plaintiff's development. The alleged purpose behind the inaccurate population submissions was to deny the plaintiff access to adequate sewage facilities for its proposed development. Plaintiff also alleged that the state and county defendants planned to condemn plaintiff's land for a public park, and purposefully delayed the building of sewage treatment facilities in order to lower the value of plaintiff's land. Applying the rational basis test set forth above and assuming all well-pleaded facts as true, the court in *Chesapeake Bay* denied a motion to dismiss plaintiff's substantive due process and equal protection claims.

In *Wincamp Partnership v. Anne Arundel County,* 458 F.Supp. 1009 (D.Md. 1978), the plaintiffs alleged that the combined actions of Anne Arundel County and the State of Maryland resulted in an unreasonable de facto moratorium on growth in the county. The moratorium was allegedly due to the conjunction of a state statute and a county budgeting decision. The state statute forbid the issuance of building permits in localities in which sewage treatment facilities would be inadequate to service the new structures. The plaintiffs did not attack the validity of the state statute. However, they did attack the county's delay in attempting to expand the Patuxent plant which, in light of state environmental law, had hindered plaintiffs' ability to exploit the development potential of their landholdings.

In response to these allegations, the court in *Wincamp* found that the County's actions appeared reasonably related to the public welfare in terms of geographical extent, duration and purpose. In addition, the court found that the County had not stopped issuing building permits in areas other than the area of plaintiffs' development. The court noted that the County was about to appropriate funds to expand various facilities in order to alleviate the sewage treatment shortage. The court also found it important that the County had developed and was acting, albeit slowly, pursuant to a plan for attacking water and sewage problems occasioned by the County's rapid growth. *Id.* at 1029. The plan was enacted pursuant to state statute.

The court in *Wincamp* concluded, with some hedging, the following:

To a large extent, given recent state environmental legislation, the issuance of building permits in areas such as Odenton Town Center is beyond the County's control without the expenditure of large sums to upgrade simultaneously sewage treatment facilities in various parts of the County. If the County is attempting to meet its sewerage problems in good faith and with reasonable speed and efficiency, then the order in which it deals with affected areas appears to be a matter within the County's discretion, so long as there is no improper motive underlying its priorities [ ] and a rational, nonarbitrary basis for the assignment of priorities.... If the County fails to carry through in good faith and with reasonable speed and efficiency its announced purpose to provide increased capacity at the Patuxent plant or if the County indefinitely postpones that expansion with no interim or long-term blueprint to solve plaintiffs' dilemma as developers, plaintiffs will of course be free to commence a new action to enforce their federal constitutional rights.

*Id.* at 1029–30. The *Wincamp* court held that the County was entitled to prevail on the record presented regarding plaintiffs' substantive due process claims.

Finally, in *Smoke Rise, Inc. v. WSSC,* 400 F.Supp. 1369 (D.Md.1975), plaintiff homebuilders challenged the validity of sewer hook-up moratoria promulgated by the Secretary of Health and Mental Hygiene for certain areas of Montgomery and Prince George's counties. In 1970 the Secretary had found that inadequate sewerage treatment facilities of the Washington Suburban Sanitation Commission (WSSC) constituted a nuisance and menace to public health. Besides imposing the moratoria, the Secretary also ordered the WSSC to undertake certain remedial measures. Thereafter, the WSSC, Montgomery County, and the Department of Health and Mental Hygiene engaged in a complex series of transactions to alleviate the sewerage crisis, but apparently made little tangible progress over the following three years. The homebuilders asserted that the Secretary's orders deprived them of their property without due process of law.

The court in *Smoke Rise* examined the reasonableness of the moratoria orders in terms of their purpose and duration. As to the purpose, the court held that the avoidance of unsanitary conditions was clearly a proper purpose. *Id.* at 1383–84. However, the court also examined the orders to determine whether local officials had prolonged the moratoria in order to implement a tacit no-growth policy. The court concluded that the comprehensive plans to improve waste water facilities belied any hidden purpose to hinder growth. The court also noted the complex interjurisdictional nature of the problem. *Id.* at 1390.

In summarizing the three above cases, the Court concludes that the regulation of sewage treatment facilities pursuant to state statute and to a comprehensive plan is clearly a legitimate government purpose and concern. The further concern served by such regulation is adequate provision of sewage treatment for new developments, so that real estate development and population growth does not outrun proper and adequate waste treatment facilities.

█ Therefore, it is clear that the regulation of adequate sewage treatment facilities in relation to new developments is clearly a legitimate government purpose. In addition, it is clear that innocent delay in provision of or a mere denial of sewer services does not, without more, constitute a violation of due process or equal protection. In order to prevail on such a claim, a plaintiff must either set forth an improper motive, *i.e.,* forced condemnation in *Chesapeake Bay, supra,* or negate every conceivable legitimate government purpose or concern, as attempted in *Wincamp Partnership, supra,* and *Smoke Rise, supra,* and thereby leave the inference that the denial of sewer services was arbitrary.

In the present case, defendants set forth two main reasons for the denial of sewer services: (1) regulating or controlling development immediately outside of Grayslake's borders; and (2) protecting and pre-

serving the capacity of the Northeast Central Interceptor. Plaintiffs counter that defendants were never really concerned about capacity because the Gurnee treatment plant had not reached maximum capacity in late 1978, when the denial was made. In addition, plaintiffs argue that Grayslake, a sore loser in the annexation negotiations, was punishing Alter for annexing to Round Lake Park, instead of Grayslake. Essentially, plaintiffs argued at trial that the reasons set forth by the defendants for the denial of sewer services were a pretext to cover up the punitive nature of Grayslake's actions.

A painstaking review of the record establishes that there was not sufficient evidence, when viewed in a light most favorable to the nonmovant, from which the jury might have found that the plaintiffs' due process and equal protection rights were violated. The plaintiffs utterly failed to meet the burden of showing that the defendants' reasons were either pretextual or not reasonably related to a legitimate government purpose or concern. In determining whether there was sufficient evidence to support the jury's verdict, the jury must have found that, based on the evidence presented at trial, there was no evidence of a legitimate government purpose or concern, or that such evidence was unpersuasive.

Defendants' presentation of evidence can be broken down into three key areas: (1) the negotiations surrounding and the rationale for the sphere of influence clause in the 1976 agreement with the County; (2) the problem of a developer playing one municipality off against another in annexation negotiations; and (3) the need for cooperative or mutual planning of large developments lying between municipalities.

Regarding the sphere of influence, Martin Galantha, Director of the Lake County Public Works Department, characterized it as a "tool for insuring compatible village-county-local planning." (Tr. 134) The sphere of influence arose out of a concern by municipalities, which were giving up local treatment plants, that they might lose some of the ability to control and have decision-making on developments immediately around their communities. (Tr. 134) The sphere of influence or service area was "a way of sharing decision making that would impact the village, sharing that with the County, so that the growth immediately around a community that would be most affected by one [development] would be a mutual or sharing proposition, and that was therefore structured in the contracts." (Tr. 134–35)

Norman Geary, a member of the Lake County Board, testified that the sphere of influence agreement was not thought of as a veto power but rather as a way of Grayslake and the County working together to develop the land outside of Grayslake. (Tr. 209–10) Geary admits that Grayslake wanted to share in control of the availability of sewer services in the area outside of its borders so that it could share in control of development that might occur there. (Tr. 206) Further, Geary denied that the purpose of the sphere of influence agreement was to diminish the ability of developers to play one municipality off against another merely for the sake of lessening competition. (Tr. 227–28) Lake County put in the sphere of influence provision in order to develop the land properly in conjunction with Grayslake. (Tr. 228)

George Bell, a member of the Lake County Board from 1971–78 and Chairman of the Public Service Committee from 1977–78, testified that the Village Board of Grayslake wanted the sphere of influence because it was concerned that the County might use some of its sewage treatment facilities outside of Grayslake's borders to conduct development under the County's auspices. (Tr. 408)

Geary later testified that Grayslake was concerned about giving up its autonomy, re: handling sewage treatment through its own plant, and it wanted to make sure that sewage treatment would be available to it. (Tr. 1314–15)

Edwin Schroeder, Mayor of the Village of Grayslake, testified that Grayslake was concerned about providing sewer service to

its own annexations, especially in light of abandoning its own treatment plant and the burden such an abandonment placed on Grayslake residents. (Tr. 1463)

Lane Kendig, former Director of the Lake County Department of Planning, Zoning and Environmental Quality, testified that Gurnee and the North Shore Sanitary District (NSSD) have agreements with Lake County which contain sphere of influence and municipal language virtually identical to Grayslake's agreement. (Tr. 1625) Kendig also testified that the Village of Green Oaks has a sphere of influence agreement with Lake County. (Tr. 1631) The Green Oaks' agreement provides that, if land located within the sphere becomes annexed to another municipality, the sphere will not cover that land anymore. (Tr. 1631–32)

Finally, Geary wrote a memorandum in 1979 to the Public Service Committee of the Lake County Board. (Pl.Ex. 112) In that memorandum, Geary discussed the concern which Grayslake expressed during negotiations for the 1976 agreement regarding development in unincorporated areas immediately outside of its borders. The memorandum reads in pertinent part:

> In negotiating for the county with the village of Grayslake there were grave concerns about the developers of the unincorporated areas surrounding Grayslake, mainly the Heartland Development areas surrounding Grayslake to the east and south of Grayslake. The concern was the developers would play one village against the other and use the county's regional system to bring about this reality. As one example—developers could say to the village of Grayslake: "Give us the zoning we want or we will annex to Round Lake Park"—which incidently lies two villages west of Grayslake and is in the Northwest area sewer service area. At that point in time, this did not seem to be a reasonable possibility—even though it had been stated by developers that is what they would do if Grayslake did not accept them on their terms! The county, by contract, assured

Grayslake that we would not be a part of this scheme and we would not supply sewer service to the areas outlined on a map in an exhibit that is part of the County/Grayslake Intergovernmental agreement.

(Pl.Ex. 112 at 2)

The above testimony and Geary's memorandum suggest that the reason for the sphere of influence agreement was to give Grayslake some say in the development of unincorporated areas lying immediately outside of Grayslake's borders. If it still owned its own sewage treatment plant, Grayslake could control development outside of its borders by accepting or rejecting applications to its own plant. Since it abandoned its plant for the good of the County's regionalized sewer system, Grayslake sought to maintain this same control over unincorporated areas, with the County's agreement, through the sphere of influence.

Cooperation between municipalities, such as Grayslake, and counties, such as Lake County, regarding sewer services is recognized by Illinois statute to be helpful and possibly necessary in order to control sewage treatment and pollution. Ill.Ann.Stat. ch. 34, ¶ 3111 (Smith-Hurd 1985 pocket part). Indeed, the impetus for the Lake County regionalized sewer was to clean up the patchwork system of local plants which led to effluents causing problems in bodies of standing water, such as Third Lake. (Tr. 1368, Bell; Pl.Ex. 149; Tr. 238, Geary).

■ Considering the substantial evidence regarding the County's regionalized sewer system and Grayslake's concern about giving up control over developments in unincorporated areas lying immediately outside of its borders, the Court finds that the evidence shows overwhelmingly that the sphere of influence is related to a legitimate government purpose or concern. This concern about controlling developments in unincorporated areas lying immediately outside of Grayslake's borders is buttressed by the fact that those developments might affect the availability and cost of sewer services to Grayslake residents.

In further support of its finding, the Court notes that the only testimony presented by the plaintiffs on the sphere of influence is that of Robert Degen, former Director of the Lake County Department of Public Works. Degen testified that Grayslake extended its sphere of influence into an area which he felt the County wished to "let free and see who would be able to handle it." (Tr. 330) Degan nowhere explains what he meant by this statement. A reading charitable to the plaintiffs' case would suggest that the County wanted to keep the area contained in the sphere of influence agreement free for developers to petition the County directly for a hook-up. However, the County never pursued this alleged desire and instead gave Grayslake its sphere of influence. In addition, this unfulfilled County desire is not relevant to the Court's finding that Grayslake had a legitimate government purpose or concern in controlling development, through access to sewage treatments, in unincorporated areas lying immediately outside of its borders.

Plaintiffs make much of the fact that Grayslake's sphere of influence covers the Unity property, which is annexed to another municipality. They argue that it is unreasonable for one municipality to be able to control development in another municipality through access to sewage treatment, and that such control serves no legitimate government purpose or concern. In support of this argument, plaintiffs point to the sphere of influence agreement with the Village of Green Oaks. The Green Oaks' agreement excludes any property presently within the sphere if the property is later annexed to another municipality. If a sphere of influence is proper at all, plaintiffs contend that Green Oaks' agreement is reasonably restricted to meet the government purpose of controlling unincorporated areas lying immediately outside of a village's borders. Plaintiffs conclude that, since Grayslake's agreement does not provide for exclusion from the sphere of property subsequently annexed to another municipality, Grayslake's sphere of influence is not reasonably related to the government purpose.

However, the evidence presented at trial does not support the argument that the 1976 Grayslake sphere of influence agreement was written with the knowledge that the Unity property would be annexed to Round Lake Park. On the contrary, Geary testified that there was no direct linkage between changing the sphere of influence in 1976 and the likelihood that the Unity property, as well as the Heartland development, would be annexed to Round Lake Park. (Tr. 211) Geary said that it was inconceivable in 1975–76 that Round Lake Park could annex the Unity property, going all the way around Grayslake and still provide services to that property. (Tr. 227–28) The annexation of the Unity property by Round Lake Park was possible only after the Illinois courts approved in late 1976 a controversial strip annexation of the Stuart Farm by Round Lake Park.

■ In light of the above evidence, the Court finds that there is no evidence to suggest that Grayslake purposefully extended its sphere of influence in 1976 to cover land annexed by another municipality. Assuming for the sake of the plaintiffs' case that the Green Oaks' agreement is the optimum in this type of agreement, the fact that Grayslake's sphere of influence does not contain an exclusion provision and therefore may not be perfectly drawn does not mean that Grayslake's sphere of influence is not reasonably related to the legitimate government purpose. The rational basis test under substantive due process and equal protection analysis does not require that legislation or governmental action be a perfect fit with the legitimate government purpose or concern. The Court has already found that the sphere of influence agreement is reasonably related to a legitimate government purpose. This finding is not affected by the slight overbreadth of Grayslake's sphere of influence, especially when the Unity property was annexed after the Grayslake agreement was executed.

(b) *Reasonably Related To The Government Purpose*

Even if the sphere of influence agreement is related to a legitimate government purpose or concern, as the Court found, the denial of sewer services could still be arbitrary and capricious. The denial is arbitrary and capricious only if it is totally unrelated to the government purpose underlying the sphere of influence agreement.

As discussed above, one of the concerns which led to the sphere of influence agreement was that a developer could play one municipality off against another to get favorable annexation terms. This tactic could have the bad side effect of an annexation impacting on the surrounding communities because the annexing municipality received inadequate contributions from the developer to put toward providing the services which the new development would require.

The defendants argue that the above scenario occurred in this case. They argue further that they attempted to control the bad effects of the Unity property's annexation to Round Lake Park on Grayslake and other municipalities. They did this by conditioning that property's sewer hook-up to an agreement with Round Lake Park to conduct mutual planning regarding the Heartland development.

The following evidence was presented at trial regarding the ability of a developer to play one municipality off against another in annexation negotiations and the effects caused by such a tactic. Kendig testified that playing one municipality off against another can be a very destructive process. (Tr. 1638) Kendig further testified that annexations can be detrimental because they impose burdens on a neighboring property. (Tr. 1626) Kendig said that some municipalities want to annex out of fear:

It is not uncommon for developers to either subtly or unsubtly threaten that if they don't get their way, they will annex to somebody else and the implication is to the Village, "My gosh, that other village will not do nearly as good as my village

will do in controlling this thing, so I had better annex it not because I want it but because I want to protect my residence [sic] from its adverse impact."

(Tr. 1627) Finally, Kendig said that the County's sewer regionalization has vastly increased a developer's ability to draw a number of municipalities into competition for annexation. (Tr. 1628)

Geary testified that annexations can have an impact on municipalities other than the one annexing. (Tr. 232–33) In his memorandum to the Public Service Committee, excerpted above, Geary wrote that the "concern was the developers would play one village against the other and use the county's regional system to bring about this reality." (Pl.Ex. 112 at 2)

Eve Lee, Chairman of the Lake County Regional Planning Commission, testified about the preannexation hearing of March 31, 1976 for the Unity property. Lee spoke to the Round Lake Park Board about where sewer was going to come from for the Unity property. (Tr. 1404) She spoke to Alter after the meeting about the concern over where sewer services would come from. Alter said not to worry because he would build a package plant if he had to. (Tr. 1406) Lee suggested that Alter talk to Grayslake about annexation because sewer services would be easier to obtain there. (Tr. 1406) He responded that "he felt that he couldn't deal with Grayslake, that he had a better opportunity to do what he wanted to do in the Vilage [sic] of Round Lake Park." (Tr. 1407)

Bell testified about a letter from the Fremont Township Board of Auditors to the Round Lake Park Board, dated March 10, 1976. This letter expressed concern over the lack of planning and lack of information disseminated to the public regarding the Unity property's annexation. (Tr. 1358) At the preannexation hearing, Bell asked how Alter expected to get sewage treatment. Alter responded that he expected to place a package sewage plant on the Stuart property. (Tr. 1395–96)

Schroeder testified that the annexation of the Unity property under the terms agreed upon by Round Lake Park would not have been attractive to Grayslake because "they gave away the store." (Tr. 1470) Schroeder explained that, in his opinion, Round Lake Park had not received enough compensation, in terms of dedicated land and utilities, in return for annexation and the services to be provided by the village. (Tr. 1471)

The above evidence shows that inadequate planning can result from a developer playing one municipality off against another in annexation negotiations. This inadequate planning affects municipalities surrounding the annexed property because the annexing municipality is unable to provide adequate services to the new development. These services, such as traffic control, schools, fire and police protection, water and sewer, are usually funded substantially by the developer, either in terms of cash contributions per acre or in actual acreage contributed to the municipality. However, when a developer plays one municipality off against another in annexation negotiations, it can receive extremely favorable annexation terms, which make the development less expensive. The concomitant effect of such extremely favorable annexations is an inability of the annexing municipality to provide services for the new development. Therefore, the burden falls on surrounding municipalities to provide services, even though paid for, to the new development.

Inadequate planning and the burden imposed on neighboring villages was also a concern regarding Round Lake Park's annexation of the Heartland development. At a preannexation meeting for the Heartland development, Lee asked Round Lake Park officials to hold off on the annexation because there was insufficient planning and information regarding impact on surrounding communities. (Tr. 1413) Kendig testified that the Lake County Department of Planning, Zoning and Environmental Quality made recommendations which made annexation of the Heartland development more expensive to the developer.

(Tr. 1569) The Department of Planning, etc. suggested that the Heartland developers make a greater financial commitment for public services in connection with the annexation. (Tr. 1569–70)

Kendig told Round Lake Park officials that the Heartland development would have "adverse impacts on the county, surrounding villages and other special districts" due to "a severe lack of planning." (Tr. 1573) When he was asked if developers, especially Alter, should be allowed to develop their property, Kendig replied: "I think if we had a situation where the village that was allowing him to do that had the opportunity to bear all of the costs and other municipal agencies were not having to take a gamble along with Mr. Alter, I would say fine." (Tr. 1646) Finally, Alter acknowledged that opposition to his package plant was linked to opposition to the Heartland development. (Tr. 763)

The above testimony illustrates the bad effects which are caused when a developer plays one municipality off against another in annexation negotiations. The inability of the annexing municipality to provide adequate services, either pre-existing or to be funded by the developer, imposes a burden on surrounding municipalities and their capacity to provide services to their own developments. The result of such a burden can be a refusal by the surrounding municipalities to provide services to the other municipality's development in an effort to preserve services for their own developments. (Tr. 1463, Schroeder; Pl.Ex. 111) If there is a refusal, the annexing municipality would have to take its chances in trying to provide the services itself.

In the present case, there was a refusal by Grayslake and Round Lake Park attempted to build a package plant for the Unity property. However, there was and is no guarantee that Round Lake Park will receive ultimate permission from federal and state authorities to build the plant, especially in light of the potential environmental impact on surrounding areas. (Tr. 399, Byers; 1404, Lee) If the plant permit

is denied, the developer who had bargained so well and gained many concessions will be left without adequate sewer services and with the prospect of delayed or altered development. This result to the developer is unfortunate but hardly undeserved in light of the developer bargaining too well for favorable annexation terms without a view to the reality of who would provide or fund sewer, as well as other, services.

The other unfortunate aspect of this case is that this delay in development, to the developer's detriment, could have been avoided by careful mutual or cooperative planning of the Unity and Heartland developments. Indeed, there was overwhelming evidence presented at trial that Grayslake attempted to achieve such mutual and cooperative planning with Round Lake Park regarding the Heartland and Unity developments. The main evidence of this attempt is the resolution passed on December 22, 1980 by the Grayslake trustees. The resolution provides in pertinent part:

> That the Village of Grayslake agrees to the connection of the Unity Ventures Development (see Exhibit A attached) to the County Interceptor located within the Village of Grayslake's "Sphere of Influence" with the understanding that the Village of Round Lake Park and the Village of Grayslake will enter into a written agreement to mutually plan the area known as "Lake Properties' Venture" [sic] lying south of Route 120 (see Exhibit B attached) and to enter into no annexation or other agreement with said "Lake Properties Venture" (Exhibit B) pertaining to said area without the consent of the other Village.

(Pl.Ex. 92)

Plaintiffs' counsel portrayed this resolution as Grayslake's attempt to extort or bully a concession from Round Lake Park, in exchange for Unity's sewer hook-up, that it would not annex the Heartland development because Grayslake wanted to annex it. However, there is absolutely no evidence in the record from which to attribute this improper purpose to the December 22, 1980 resolution. In fact,

Schroeder's uncontradicted testimony is that Mr. Parkham, a Round Lake Park trustee, suggested the compromise embodied in the resolution. (Tr. 1465–66)

According to Schroeder, Grayslake was willing to consent to the Unity property's hook-up in exchange for a written agreement to mutually plan the Heartland development, in light of adequate sewer capacity. (Tr. 285) Grayslake was not trying to extract from Round Lake Park a concession that it not annex Heartland without Grayslake's approval. (Tr. 285) Rather, the resolution sought a mutual agreement that neither village would annex the Heartland without mutual or cooperative planning. (Tr. 285–86) Unless such an agreement was reached, Grayslake would not consent to the Unity property's hook-up. (Tr. 286) Schroeder later told Bernard Ruekberg, one of Alter's assistants, that he did not think that it was a good idea for Round Lake Park to annex the Heartland development. (Tr. 290)

George Scherer, Mayor of Round Lake Park, testified that Schroeder said that, if Round Lake Park would agree to work with Grayslake on the Heartland development, Grayslake would possibly give a sewer hook-up to the Unity property. (Tr. 572) In his conversation with Ruekberg, Schroeder said that the intent of the resolution was for Round Lake Park to give Grayslake a chance to help Round Lake Park plan the Heartland development and that the minute the proposal was signed, Grayslake would let the Unity property connect right away to the Northeast Interceptor. (Tr. 617, Ruekberg; Pl.Ex. 126)

Lee testified that Schroeder called her to see if cooperative planning of the Heartland development was possible. (Tr. 1416) In fact, Lee, Bengson, and Schroeder met at Lee's home and the two mayors agreed at this meeting that the Boards of Grayslake and Round Lake Park would meet together. (Tr. 1417–18) Regarding Schroeder's explanation for Grayslake's refusal to give its written consent to the Unity property's hook-up, Lee said that Schroeder's concern was toward planning the whole

area and how the developments would be serviced. (Tr. 1435) Finally, Lee said that Grayslake was only trying to engage in cooperative planning with Round Lake Park, "which is what it was we were trying to do in the first place. That was our charge from the County Board, to get municipalities to begin talking to one another about what was going to happen on their boundaries." (Tr. 1440)

Kendig recommended that "the cooperative planning that was then going on with the County, the comprehensive plan, that the effort be projected into this particular controversy and that hopefully Round Lake Park and Grayslake and the County would sit down and work out a land use plan for the area that would enable the various jurisdictions to adequately support the proposed or a given level of development." (Tr. 1591) Finally, Kendig testified that the Heartland, Unity and Stuart Farm developments had to be treated together for planning purposes because they were all annexed by Round Lake Park and would rely on the County's facilities for some services. (Tr. 1574)

The above evidence shows overwhelmingly that mutual or cooperative planning of the Heartland and other developments was a desired and rational goal and that such planning was the purpose behind the December 22, 1980 resolution. The Court has already found that the sphere of influence agreement was reasonably related to a legitimate government concern or purpose, *i.e.*, control of developments lying immediately outside of Grayslake's borders. Since the sphere of influence agreement is a reasonable method for controlling developments lying immediately outside of Grayslake's borders, its use to further mutual or cooperative planning of developments lying between Grayslake and Round Lake Park, which is a desirable and rational goal, must also be reasonable.

■ Therefore, the Court holds that there was not sufficient evidence on which the jury could conclude that the conditional grant of the Unity property's hook-up as embodied in the December 22, 1980 resolu-

tion, was arbitrary, capricious or improper. Rather, the Court holds that the evidence presented at trial shows conclusively that, not only was Grayslake's denial of sewer services reasonable under the sphere of influence agreement, but also the conditional grant of the Unity property's hook-up in exchange for mutual or cooperative planning of the Heartland development was reasonably related to controlling and mutually planning development lying between Grayslake and Round Lake Park.

### E. CIVIL RIGHTS IMMUNITY

Defendants argue that the County Board members and village trustees who are sued in their individual capacities are immune from damages under either absolute or qualified immunity. Defendants argue that the Board members and village trustees are immune from damages under absolute immunity because they were acting as legislators when they entered into the sphere of influence agreement. In addition, defendants claim that the village trustees acted as local legislators when they denied the Unity property's sewer hook-up. Plaintiffs counter that the hook-up denial did not involve the promulgation of legislation, was a discretionary determination with respect to a single parcel of land, and therefore is not entitled to absolute immunity.

*Reed v. Village of Shorewood*, 704 F.2d 943, 952–53 (7th Cir.1983), holds that local officials are absolutely immune from liability for actions taken in a legislative, as opposed to an administrative, capacity. Legislative acts involve "the promulgation of general or prospective legislation or establish guidelines by which the future conduct of certain groups is to be judged." *Coffey v. Quinn*, 578 F.Supp. 1464, 1467 (N.D.Ill.1983). Administrative acts involve the application of already enacted ordinances or recognized policies to specific instances.

Against this background, the Court finds *LaSalle National Bank v. County of Lake*, 579 F.Supp. 8 (N.D.Ill.1984) to be dispositive of the absolute immunity ques-

tion here. In that case, the same plaintiffs challenged the same actions taken by the same defendants under the sphere of influence agreement. The court concluded that some acts were legislative and some were administrative:

> However, it appears that not all of the alleged actions were taken in a legislative capacity. For example, the decision by the Lake County Board and the Village of Grayslake to give the Village of Grayslake a veto over sewer applications within Grayslake's sphere of influence appears to have been legislative, because it was a decision of general application. However, the decision by the Village of Grayslake to deny the specific application of plaintiffs appears to have been an administrative action, since the trustees were then considering a specific proposal by a specific group and doing so in their capacity as administrators of an already-passed law.

*Id.* at 13.

█ The Court agrees with the analysis and result in *LaSalle National Bank.* Therefore, the County Board members, the village trustees and Mayor Schroeder are absolutely immune from damages for any acts surrounding the negotiation and enactment of the sphere of influence agreement. However, the village trustees and Mayor Schroeder are not entitled to absolute immunity for their acts denying the Unity property's sewer hook-up. To the extent that the village trustees and Mayor Schroeder acted in an administrative capacity in denying the hook-up, they are entitled to only qualified immunity. *Id.* at 13 n. 7. *See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

█ In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court removed the subjective good faith element from determinations of qualified immunity. The objective standard in *Harlow* shields public officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Id.* at 818, 102 S.Ct. at 2738. *Harlow* establishes a two-part test. First, the court must look to currently applicable law and determine whether that law was clearly established at the time the action in question occurred. *Id.* If the law was not clearly established, the public official will be immune. Second, if the law was clearly established at the time the action occurred, the public official must show that, because of extraordinary circumstances, "he neither knew nor should have known of the relevant legal standard." *Id.* at 819, 102 S.Ct. at 2738.

█ In the present case, the law applicable to constitutional violations for denial of sewer services was and is not clearly established. While the law applicable to analogous cases involving denial of zoning variances and building permits is clearly established, what constitutes an arbitrary and capricious denial of sewer services is not easily defined by case law. In the same vein, what constitutes a legitimate government purpose or concern must be determined on a case-by-case basis. Therefore, since it finds that the applicable law was and is not clearly established, the Court holds that the village trustees and Mayor Schroeder are entitled to qualified immunity from damages relating to possible violations of plaintiffs' civil rights.

## IV. CONCLUSION

For the reasons stated above, defendants' j.n.o.v. motion is granted for both the antitrust and civil rights verdicts. Accordingly, the conditional motion for a new trial is denied and judgment is entered in favor of the defendants.

IT IS SO ORDERED.